## BURNETT v. ROBERTS

(No. 2204; February 10, 1942; 121 Pac. (2d) 896)

For the appellant, there was a brief by *Ewing T. Kerr,* Attorney General; *Harold I. Bacheller,* Deputy Attorney General; and *Arthur Kline,* Assistant Attorney General, all of Cheyenne, and *Raymond & Guthrie* of Newcastle, Wyoming, and oral argument by *Mr. Kline.*

For the respondent there was a brief by *Otis Reynolds* of Sundance and *Preston T. McAvoy* of Newcastle, and oral argument by *Mr. McAvoy*.

KIMBALL, Justice.

Charles D. Burnett was injured March 6, 1940, while engaged in work incidental to the manufacture of grain-doors, and claimed compensation under the Workmen's Compensation Law, alleging that the injury was sustained while he was a workman in the employment of Mason Roberts. He was allowed compensation for total, permanent disability caused by the injury. On appeal by the alleged employer, the sole question is whether there is substantial evidence to support a finding that the relation of the parties at the time of the injury was that of employer and employee.

Both Burnett and Roberts are experienced timber workers, and were, at the time of the injury, working on a tract of wooded land in Crook County. The land was owned by C. A. Ward who by contract made in November, 1938, gave Burnett license to occupy the land and take therefrom the merchantable timber for which Burnett agreed to pay to Ward stumpage at the rate of $2.50 per thousand feet.

Operations under this contract were carried on by Burnett until about October 1, 1939. He had on the

land three mills: the saw mill where logs were sawed into lumber; the planing mill where some of the lumber was planed, and the grain-door mill where some of the lumber was used in the making of grain-doors. (A grain-door is a close-fitting movable door used on the inside of a railroad box-car to close the lower part of the door-opening and prevent leakage when the car is loaded with grain in bulk.) The three mills were separate, though the saw mill and the grain-door mill were only 75 or 80 feet apart.

About October 1, 1939, Burnett sold the saw mill to Roberts, and made a deal whereby, in the language of Burnett, he "turned the timber" to Roberts who agreed to pay Burnett $3.50 per thousand feet, $1.00 per thousand more than Burnett had to pay Ward. Thereafter, Roberts did the logging and ran the saw mill. Burnett retained and continued to operate the planing mill and the grain-door mill. Roberts cut the logs into board lumber and railroad ties. He sold some of the board lumber to Burnett who resold it after he had planed it at his planing mill. The rest of the board lumber, except a small part that was delivered to Burnett for use in making grain-doors as presently explained, was hauled in trucks from the saw mill to nearby towns for sale by Roberts. The ties and grain-doors were for sale to a railroad company whose line runs through the town of Moorcroft. There is no material conflict in the evidence in regard to the terms of the contract for the manufacture of the grain doors, and we state the facts substantially as related by Burnett himself.

It was the practice of the railroad company to order grain-doors from the person who had the tie contract. They were ordered from Burnett while he was in charge of all operations on the land, and on October 1, 1939, when Roberts took over the logging and saw mill operations, Burnett had on hand a considerable number of doors that had not been delivered. It was

evidently known or taken for granted that future orders for doors would come to Roberts, who had the tie contract. Burnett had retained the grain-door mill including machinery, a cross-cut saw, a trimmer saw and a gasoline engine. Burnett also had a truck suitable for hauling the doors to the railroad. After some preliminary conversations, an oral contract for the manufacture and delivery of the doors was made in the forepart of October, 1939. On this subject Burnett testified as follows:

"We talked it over outside a day or two before that and then we was in Mr. Robert's house when I told him just what I would do about making them. [The deal was that] he furnished the lumber free of charge to me, put it down next to the trimmer saw and I was to furnish the nails and nail the doors and deliver them into Moorcroft, and when they were shipped, he was to pay the loaders and I was to get half of what they brought." At another place in his testimony he states the terms of the contract thus: "Mr. Roberts was supposed to put the lumber down where we could get at it at the cut-off saw or trimmer saw. I was to manufacture the doors, furnish the nails and haul them into Moorcroft whenever he got a contract and whenever he got an order for them. [I was to receive] fifty percent of what they came to after the loading was taken out."

The express terms of the contract did not fix the number nor describe the kind of grain-doors to be manufactured by Burnett. Those were details dependent on the orders from the railroad company. It was evidently understood that there would be enough doors to fill orders received from the railroad company while lumbering operations were being carried on by the parties at the place where their mills were then located. Later, at a time not definitely shown, it became known that the required number was about 4000. Burnett had

been making grain-doors for some time before, and it was of course contemplated that, in continuing that work under his contract with Roberts, he would make doors to conform with specifications, express or implied, in the orders. The orders were also to control the times and place of delivery. At Moorcroft "there was just one place to take them."

March 6, 1940, when Burnett was injured, he was alone in the grain-door mill oiling machinery. The injury was a severe cut in the head by a buzz saw, one of the machines used in making grain-doors. Before his injury he manufactured about 3000 doors and piled them at a place selected by him. He did most of the work himself in his own mill using machinery that he owned and kept in repair. There was no evidence that Roberts ever exercised any control over the details of the work or of Burnett's physical conduct. Helpers were employed by Burnett and worked for him without direction or control by Roberts. Helpers who asked pay for their work were paid by Burnett. He was injured before any of the doors had been taken to Moorcroft.

The making of the doors took only a part of Burnett's time, about one-half. At other times he was engaged in three other activities. He ran the planing mill where he planed lumber that he bought at the saw mill of Roberts, hauled to the planing mill, and then, after it was planed, to market. At other times he hauled lumber and ties to market for Roberts, a service for which he was paid at the rate of $3.00 per thousand feet for lumber and 12 cents each for ties. He had in the vicinity a ranch and livestock, and made trips to the ranch which he said were "mostly on Sundays" to look after the livestock. Apparently he was free to decide for himself how his time should be divided between these different activities. He was not listed as an

employee by Roberts in keeping his books or in reporting to the Workmen's Compensation Department.

Roberts operated the saw mill, acted as his own sawyer in the mill, and had charge of the logging operations. One of his employees was Roy Jones, Burnett's brother-in-law. When Burnett was disabled, and it became apparent that he could not fully carry out his agreement to make and deliver the grain-doors, Roberts asked Jones if he "would go ahead and see that the doors were made." Jones then "finished out that contract" for his brother-in-law "to protect his interests."

Roberts gave no directions, except to say how many doors were to be made, and Jones received no pay from Roberts for doing the work. Jones and helpers that he selected made enough doors to fill out the needed number (4000), and then hauled all of them to Moorcroft. The work was completed in July, 1940.

In Fox Park Lumber Co. v. Baker, 53 Wyo. 467, 487-489, 84 P. (2d) 736, 743, 120 A. L. R. 1020, 1029, we mentioned some of the many tests for determining whether a person is an employee within the compensation act or an independent contractor. It was assumed in that case, and is conceded in the present case, that the tests are those developed under the common law relating to master and servant. The test which in Fox Park Lumber Co. v. Baker, supra, was referred to as "outstanding," and, in Stockwell v. Morris, 46 Wyo. 1, 8, 22 P. (2d) 189, 190, as the "controlling or principal" test, is whether or not the alleged employer had the right to control the details of the work. Other so-called tests show the matters of fact to be considered in determining who had the right to exercise such control.

It is not contended that the contract for the making of the grain-doors contained anything to indicate that Roberts retained the right to control the details of the work to be done by Burnett, nor is it contended that during the progress of the work Roberts ever exercised

or attempted to exercise such control of the work of Burnett, his occasional helpers, or of Jones who completed the contract for Burnett. It may be conceded, however, that the right of control may in some cases be inferred from surrounding circumstances and the conduct of the parties, although it is neither given by the express terms of the contract, nor in fact exercised during the course of the work.

Before the contract was made, Burnett had been occupied in making grain-doors as a part of his business, and this fact would tend to show, at least, that the parties might reasonably have intended that control of the methods of work should be left to him as the one better fitted to judge in regard thereto. See 16 Am. & Eng. Enc. of Law, 191 (article by Tiffany).

It is admitted that Burnett furnished a part of the materials and all of the appliances, and that he employed, controlled and paid the helpers, required for the performance of the stipulated work. The materials were nails that went into the doors and oil and gasoline used in connection with the machinery. The appliances were all the machinery and tools needed in the work in the grain-door mill, and the truck for hauling. The mill was a small factory, where Burnett had no contact with Roberts or with workmen who assisted Roberts in logging and running the saw mill.

The testimony of Burnett and Jones contains some general statements to the effect that Roberts was the boss in control of the "camp," and of the operations on the land, and this testimony is the basis for the contention that Roberts was in control of the premises where the work was done. It is clear, however, from other testimony of the same witnesses, that they did not intend to say that Roberts ever had control of the grain-door mill. Burnett, who occupied the land under license from Ward, testified that he "turned the timber" and sold the saw mill to Roberts "for the purpose

of allowing him to saw this timber into ties and lumber," and that the grain-door mill that he retained was "a separate and distinct outfit from the saw mill." Jones, after testifying that Roberts was his boss, explained that he meant to refer to the time when he was logging in the woods. When he was asked whether Roberts was in charge of the operation of making the doors, he answered "Well, he was running the mill (meaning the saw mill) and furnishing the lumber for the grain-doors." Further, from Jones' testimony: "Q. Mr. Roberts, did he work down there or did you see him down there at the grain door outfit? "A. No, Mr. Roberts was sawyer in the mill. "Q. He then was not down or around in charge of the grain door outfit? "A. He was by there."

It is held that the right of each of the parties to terminate the relation at will, without incurring liability to the other, is a matter to be considered as tending to show that the relation is that of master and servant. Fox Park Timber Co. v. Baker, supra. Burnett testified that Roberts could discharge him "at any time he wanted to." Also, that the contract was terminable at his (Burnett's) pleasure. If the witness intended by this testimony to assert that either party could have terminated the contract at will without incurring liability, he stated a conclusion or opinion not justified by the terms of the contract or the conduct of the parties. See, Sluzis' Case, 292 Mass. 351, 354, 198 N. E. 262, 264; Hubbard v. Dept. of Labor, 198 Wash. 354, 360, 88 P. (2d) 423, 426-427. The contract was for the mutual benefit of the parties, and each was a contractor with the other to perform a particular part of the work and furnish a part of the materials necessary in the manufacture and delivery of the articles whose sale price was to be divided between them. Though they were neither partners, nor joint adventurers in a technical sense, they had a common interest in having

the contract fully performed in order to produce the fund from which both were to be paid. The duty of each to permit the other to perform his part of the contract was never questioned. There was no question of nonperformance until Burnett was disabled, and then it was promptly arranged that the work Burnett had partly performed should be completed on his behalf by his brother-in-law.

We think there was no substantial evidence to support the finding that Burnett was an employee while performing work under the grain-door contract. All the matters of fact to be considered in determining that question seem to point the other way. The work was not under or incidental to any general employment contract. Burnett controlled the hours of work; owned and kept in repair all the machinery used in the work; occupied and controlled the place of work; employed and controlled helpers; furnished part of the materials, and had a joint interest in the proceeds of the business.

It is suggested that Burnett was Robert's employee in hauling lumber and ties from the saw mill to market, and that that fact justifies the finding that he was an employee when performing work under the grain-door contract.

The testimony in regard to the arrangement for hauling of lumber and ties by Burnett, and how much time he spent in that work, was conflicting. The facts not in dispute were that he did some hauling, using his own truck, which he had a permit to operate as a common carrier of property, and that his pay received from Roberts was based on the amount hauled at the regular carrier rate. Roberts testified that Burnett's son, Kenneth, who did not testify at the trial, had the hauling contract and that hauling done by the father was to help out his son.

Burnett testified that the hauling was under a deal made when he "turned the timber" to Roberts. The

deal was that he "was to get $3.00 a thousand to haul lumber into Moorcroft and 12 cents a tie to haul the ties into Moorcroft." He hauled "between times," when he was not making grain doors, or working in connection with his planing mill. He thought he spent one-third of his time in such hauling, and that the last load was hauled by him "possibly ten days before" he was injured. Neither party undertook to prove the extent of the control that Roberts exercised over the hauling, and it is probably to be inferred that he acted as an ordinary shipper dealing with a carrier. See Brothers v. State Industrial Acc. Com., 139 Or. 658, 12 P. (2d) 302.

If it be conceded that the evidence was sufficient to justify the finding that Burnett was an employee while working under a contract hauling ties and lumber from the saw mill, it would not follow that he was not an independent contractor in carrying out the provisions of the grain-door contract. The authorities, without any noticed dissent, hold that a person may be an independent contractor in some work and an employee in other work for the same employer, and that in such a case the right to compensation arises only when the worker is injured while engaged in the work in which he was an employee. 27 Am. Jur., Independent Contractors, § 20; 71 C. J. 477; Wright v. Wilkins, 222 Ky. 144, 300 S. W. 342; Clough v. Malley's Estate, 126 Conn. 379, 11 Atl. (2d) 398; Bradley's Case, 269 Mass. 399, 169 N. E. 399.

The order of award will be reversed.

RINER, Ch. J., and BLUME, J., concur.