GLEN N. LICHTY, doing business as Lichty Construction Company,

*Plaintiff and Appellant.*

vs.

MODEL HOMES, a Wyoming Corporation,
*Defendant and Respondent.*

(No. 2437; November 29th, 1949; 211 Pac. (2d) 958)

For plaintiff and appellant the cause was submitted on the brief of Harold M. Johnson of Rawlins, Wyoming and Arthur Kline of Cheyenne, Wyoming and oral argument by Mr. Kline.

There was no appearance for defendant and respondent.

## OPINION.

RINER, Chief Justice.

Direct appeal proceedings bring this case here to review a judgment of the District Court of Carbon County, the appeal being taken only from that part of said judgment which denied a recovery to the plaintiff, Glen N. Lichty doing business as Lichty Construction Company, on the first cause of action alleged in his petition as plaintiff in said court. He, as appellant, will usually be so designated as plaintiff or by his surname. The defendant and respondent will be referred to either as the defendant or as the Homes Company.

Plaintiff's petition set forth two alleged causes of action. The first one sought to recover the sum of $1045 and interest, the amount claimed to be due plaintiff under the terms of a written contract entered into between plaintiff and defendant on August 29, 1945. This contract attached to and made a part of plaintiff's petition reads as follows:

August 29, 1945.

"The Model Homes Company
Rawlins, Wyoming.

Gentlemen:

I hereby propose to furnish the following at the rates hereby quoted:

One TD 18 IHC track tractor equipped with ten yard scraper, hydraulic dozer, ripper and man operator at $11.00 per hour.

This quotation includes the payment of State and government tax on all men employed by me.

Above equipment to be used in Mountain View Addition, City of Rawlins, Carbon Co., Wyoming.

This quotation per hour applies only on actual working operating hours, and time slips will be turned in daily at your offices on the project.

This quotation carries the provision, that your company stands one-half the $200.00 expense of return movement of equipment from Sweetwater Creek location to Rawlins, Wyoming (the other half of this $200.00 cost is being borne by the O'Dell Construction Co.). In other words the $11.00 per hour operating cost is being increased by a total of $100.00 total. This $100.00 will be due and payable any time after thirty days.
Work to commence not later than September first, Saturday.

Lichty Construction Co.<br>by /s/ Glenn N. Lichty.

Accepted

The Model Homes Company
by /s/ Jay E. Shideler, President."

The second cause of action of plaintiff's pleading is now without the issues required to be considered on this appeal inasmuch as on the trial of the cause defendant admitted the indebtedness sued for therein and it was stipulated by the parties in open court that judgment should be entered in favor of the plaintiff on that cause of action. This was done.

In its amended answer the defendant admitted the execution of the contract set forth above and the payments theron as alleged in plaintiff's petition but denied that anything was due and owing to plaintiff. As an affirmative defense defendant answered:

"That during all the times pertinent hereto, there was in full force and effect, Federal 'Price Control Extension Act of 1946', formerly entitled 'Emergency Price Control Act of 1942,' as amended (50 U.S.C.A. 901, et seq.)"

It was stated in connection therewith that pursuant to said Act and in conformity therewith the Office of Price Administration had issued Regulation No. 134 which as amended (Amendment No. 19, effective July 19, 1945) was in full force and effect from May 11, 1942 during all of the times in plaintiff's first cause of

action and defendant's answer mentioned. It was answered also that Regulation No. 134 contained in part a provision reading:

"On or after July 1, 1943, regardless of any contract, lease or agreement: (a) No person shall lease, or furnish for use, and no person in the course of trade or business shall rent, or receive for use, any construction or road maintenance equipment on a bare basis, or make or receive payment for any such equipment, at a price in excess of the maximum rental price established by this regulation for such equipment."

The defendant's answer further alleged that the services furnished by plaintiff pursuant to the contract set forth above were subject to the provisions of said Regulation 134 and that the maximum price which plaintiff could charge therefor under the regulation aforesaid for the tractor and dozer fully operated was not to exceed $8 per hour, for the tractor and ripper fully operated $8.25 per hour, and for the tractor and scraper fully operated $9.50 per hour. The answer averred also that said Regulation 134 prohibited a charge or recovery for the use of such equipment unless it was "actually in use or required to be available for use and used from time to time during any given period of operation". A copy of said Maximum Price Regulation 134 and Amendment No. 19 thereto were annexed to the defendant's answer and made a part thereof.

All affirmative allegations of the answer were denied by plaintiff in his reply.

At the commencement of the trial the parties stipulated that plaintiff had performed 603¾ hours of work under the contract above quoted and that defendant had paid the plaintiff $5688.75 on the contract price for such work. This was for 508¾ hours services and for half of the moving expense amounting to $100 as per contract agreed, and left due and unpaid for ser-

vices performed under the terms of said agreement, the sum of $1045 which amount defendant declined to pay for the reasons pleaded in its affirmative defenses above described.

The cause was tried to the court without a jury with the result that plaintiff was adjudged to "take nothing" by "the first cause of action alleged in his petition."

There is very little controversy relative to the facts of this case. As we have seen under the contract quoted verbatim herein, plaintiff agreed to furnish defendant a track tractor equipped with ten yard scraper, hydraulic dozer, ripper (sometimes called a "rooter") and a man operator for the sum of $11 per hour, this price including payment of State and Government tax on all men employed by Lichty, and this rate applying only "on actual working operating hours" time slips to be turned in daily to the Home Company offices. This equipment was to be used in the named Addition to the City of Rawlins, Wyoming. The Homes Company was to pay half the cost of moving this machinery and these tools to Rawlins, the other half to be defrayed by another company which was likewise engaged in doing construction work in the City of Rawlins.

Plaintiff performed this contract as required, all the equipment so furnished in plaintiff's possession and under his control at all times while accomplishing the necessary services and being at or near the place where the work was to be done as well as being available for use at all times. Mr. Lichty testified concerning the purpose and use of these furnished items of machinery that a tractor had to be equipped for handling construction work of this kind or else it is "no good to anyone". He said:

"a tractor is not equipped unless it has the machinery to do this custom work like we were doing for Model Homes, and your jobs around the vicinity, without

having a scraper, a dozer, a control unit and a ripper at all times. It may be called on any time to be a scraper or a ripper or a dozer."

Explaining the function of these items of machinery which were the subject of the contract aforesaid, he also told the court:

"Of course, the tractor has to be there to operate anything. The scraper hauls dirt, and if it is a long haul, it would be impractical to haul it any great distance with a dozer. Anything over one hundred fifty feet is too far to think of hauling with a dozer—and, in fact, that is out of line; so it would be necessary to do it with a scraper. But if you get a short haul and lots of rock, and such as that, it is necessary to use a dozer; and if you are going to dig a basement, the only way you could do it would be with a dozer; and the same way if you use it in rocks or frost hardened dirt, or anything like that, you are going to have to have a ripper to do more or less ripping. A ripper is a piece of equipment that costs lots of money and is used less in the construction field for what you pay for it than any other piece of equipment. But when he does have to have it, it would be impossible to be without it. You wouldn't get your job done without it, except with dynamite, and that would be more expensive than owning a ripper and using it."

He stated, too, that it was necessary to have all this equipment on hand for the particular work required by the Homes Company and that "if it wasn't on the job at all times it was available within a few minutes to get it there" for the defendant.

Mr. Denning, the superintendent in charge of construction work for the defendant, seems to have confirmed Mr. Lichty's statements for he, too, testified that in order to successfully complete the work required to be done for the Homes Company it was necessary that all of these pieces of equipment listed in the contract aforesaid should be used or be available at all times when needed; and that when Denning requested,

equipment and men to operate the same upon the work so as to be available for it, the plaintiff never refused his having it.

It is the contention of appellant that the judgment below is erroneous because under basic United States statutes concerning the matter, the Office of Price Administration had neither the power nor the authority to issue any regulation which could properly be made applicable to contracts like the one the parties in this litigation had executed and which is here in question and hence Price Regulation 134 can not rightly be invoked as a defense to plaintiff's alleged first cause of action.

The authority of the Price Administrator to issue Maximum Price Regulations is to be found in the Emergency Price Control Act of 1942, Title 50 Appendix U.S.C.A., Sections 901-946, Section 902 of said Act Subsection (a) reads:

"Whenever in the judgment of the Price Administrator (provided for in section 201) (section 921 of this Appendix) the price or prices of a commodity or commodities have risen or threaten to rise to an extent or in a manner inconsistent with the purposes of this Act (sections 901-922, 923-946 of this Appendix), he may by regulation or order establish such maximum price or maximum prices as in his judgment will be generally fair and equitable and will effectuate the purposes of this Act (said sections) . . . ."

From this excerpt it is readily seen that the "price or prices" of a "commodity or commodities" are what are placed under the control of the Price Administrator. The term "commodity", with its ordinary meaning considerably enlarged, is defined in U.S.C.A. Title 50 App., Section 942 (c) of the Act thus:

"The term 'commodity' means commodities, articles, products, and materials (except materials furnished for publication by any press association or feature ser-

vice, books, magazines, motion pictures, periodicals and newspapers, other than as waste or scrap), and it also includes services rendered otherwise than as an employee in connection with the processing, distribution, storage, installation, repair, or negotiation of purchases or sales of a commodity, or in connection with the operation of any service establishment for the servicing of a commodity:"

In Lincoln Savings Bank of Brooklyn vs. Brown, 137 Fed. 2d 228 the United States Emergency Court of Appeals held that the storage of "securities, jewelry and valuable papers" was subject to the provisions of the Emergency Price Control Act and the court says in the course of its opinion:

"It is conceded by the complainant that jewelry is a commodity. Securities and valuable papers must be considered commodities within the meaning of the Price Act as well as in general usage. They have heretofore been so designated by the courts."

Announcing its views as to the meaning of "commodity" in the Price Act aforesaid the court also said:

" 'The term "commodity" means commodities, articles, products, and materials * * *, *and it also includes services rendered* * * * *in connection with the* processing, distribution, *storage,* installation, repair, or negotiation of purchases or sales *of a commodity,* or in connection with the operation of any service establishment for the servicing of a commodity: (exclusions not relevant here). (Italics supplied.)

"We believe the pertinent language in Section 302 (c) is commendably precise. Congress not only indicated affirmatively the wide area subject to price control, but it also detailed by specific exceptions those areas to which the authority of the Price Administrator could not extend. Congress did not interject the term 'commodity' in naked form, leaving it to be clothed with its customary connotation by those charged with construing the Price Act. The garb of 'commodity' in its present role is definitely prescribed and

a number of new and unusual garments are included. 'Commodity' is defined to mean *inter alia,* 'commodities, articles, products, and materials * * *.' This is an extremely broad definition encompassing, we believe, all things possessing the attribute of tangible existence, i.e., all space-displacing objects, which are the subject of barter, transfer, sale, or other transactions involving the exchange of money or other value. But Congress did not stop here; it stated that the term as used in the Price Act should also include 'services rendered * * * in connection with the * * * storage * * * of a commodity, or in connection with the operation of any service establishment for the servicing of a commodity * * *.' Section 302 (c) thus expresses an unequivocal Congressional intent that storage services rendered in connection with any articles, products, or materials not specifically exempted were intended to be subject to the Price Administrator's control."

The opinion in the case just reviewed was by Chief Judge Fred M. Vinson, now Chief Justice of the United States Supreme Court.

In Taub vs. Bowles, Price Administrator, 149 Fed. 2d 817 the United States Emergency Court of Appeals had occasion to reiterate the views expressed in the Lincoln Savings Bank Case supra as to the meaning of the words "commodity or commodities" and remarked:

"Complainants insist that intoxicating liquor is not a commodity within the intent of the Emergency Price Control Act. Section 2(a), 50 U.S.C.A. Appendix, § 902(a), grants the Administrator power to establish maximum prices for a 'commodity or commodities', defined in Section 302(c), 50 U.S.C.A. Appendix, § 924(c), as 'commodities, articles, products, and materials'. The Act contains no limitation upon the term; intoxicating liquor, though not specifically included is not excepted. The Congressional definition encompasses 'all things possessing the attribute of tangible existence, i.e., all space-displacing objects, which are the subject of barter, transfer, sale, or other transactions involving the exchange of money or other value.' "

The Lincoln Savings Bank case aforesaid was cited.

It is, of course, to be here observed that the facts of the two cases briefly reviewed above are different from those appearing in the case at bar but they do throw considerable light upon what should be regarded as a "commodity or commodities" under the Price Act aforesaid.

Coming decidedly closer to the legal question involved in the case at bar is another decision also rendered by the United States Emergency Court of Appeals, Automatic Fire Alarm Company vs. Bowles, Price Administrator, 143 Fed. 2d 602. In that case the complainants brought an action to set aside a provision of Maximum Price Regulation No. 165, which endeavored to establish a price ceiling on *services* rendered by them in connection with the operation and maintenance of certain equipment used for the detection of and protection against fire. This equipment was so connected with a central office by electrical wiring as to cause an alarm to sound in that office when a fire occurred. There was also included in the equipment a sprinkler system installed in store rooms which would automatically operate when fire caused a certain temperature rise in such rooms. Complainants entered into contracts with store owners who desired such fire protection agreeing to install the equipment and operate it and maintain it for agreed fixed periods of time at specified charge rates. The Price Administrator by his Regulation No. 165 above mentioned undertook to control these charges under price ceilings established by him through said Regulation.

Outlining the contentions of the parties and announcing its conclusions thereon contrary to the position taken by the Price Administrator, the court used this language:

"It is the complainants' basic contention that insofar as the Administrator seeks by the Regulation to establish a maximum rate of charges for services rendered in the maintenance, supervision, operation and inspection of such equipment he is exceeding the authority conferred upon him by the Act. They do not seriously contest the Administrator's right to establish maximum charges for services rendered in the repair, rental or installation of such equipment, but they point out that they do not rent their equipment and make no charges for its repair and only in very rare instances for its installation. In this contention they are, as we have already said, supported by the record. The Administrator contends, however, that since the complainants obligate themselves under their contracts 'to maintain such signalling system in good working order' they have the equivalent of an obligation to keep the system in repair. From this he argues that keeping the signalling equipment in repair is the major consideration for the charges which the complainants make. "We think that the Administrator's contention is untenable. The equipment which the complainants install in their customers' premises is and remains their own property. It constitutes the tools with which they perform the protective services for which their customers pay. Of course the complainants install the equipment and keep it in repair but in installing and repairing it they are merely installing and repairing their own tools and for so doing they customarily make no charge. What they do charge their customers for is the protective service which they render those customers through the continuous daily and hourly use of these tools. In other words their service is the constant maintenance and operation of the system installed in the customer's premises in conjunction with the central office with which it is connected, whereby signals received at the central office from the equipment installed in the customer's premises are at once reported, relayed to the proper authorities, and investigated, to the end that the customer's sprinkler system may be maintained at all times in working order and that when fires occur the promptest possible notice thereof may be given to the fire fighting forces. The customer has no interest in adorning his building with

intricate electrical devices; what he pays for is prompt notification of trouble in his sprinkler system and of the outbreak of fires in his building. Without this latter service the electrical devices are wholly useless to him."

The opinion further reasoned on the point:

"We observe at the outset that the Emergency Price Control Act is directed to the control only of the prices of commodities and the rents of housing accommodations. Services of the character here involved are obviously not commodities within the ordinary meaning of the term. Section 302(c) of the Act, 50 U.S.C.A. Appendix § 942(c), however, somewhat expands the ordinary meaning of the term by providing that when used in the Act 'commodity' means not only 'commodities, articles, products, and materials', but also includes 'services rendered otherwise than as an employee in connection with the processing, distribution, storage, installation, repair, or negotiation of purchases or sales of a commodity, or in connection with the operation of any service establishment for the servicing of a commodity.' It will thus be seen that the Act specifically includes services rendered in connection with the installation or repair of a commodity. The Act, however, does not state that the term 'commodity' is to be construed as including in its meaning services rendered in connection with the maintenance, supervision, operation or inspection of a commodity. Nor do we think that this meaning is to be implied. While the Act is to be given a liberal construction in order to effectuate its highly remedial purposes, it is clear that those purposes are to limit the prices of commodities and rents. *Services are not commodities in the ordinary and accepted meaning of that term and they are, therefore, not within the spirit or purpose of the Act except to the extent that they are expressly directed by the Act to be considered as commodities.* Compare State v. Standard Oil Co., 1912, 61 Or. 438, 123 P. 40, 43, Ann. Cas. 1914B, 179." (Italics supplied).

It should be noted that the Price Administrator in the litigation last above reviewed endeavored to put a price

ceiling upon charges for the operation and maintenance of equipment "the use, control and with very infrequent exceptions, the ownership of the devices thus installed in the customers' premises" being retained by complainants. The principal services contracted for and rendered by the plaintiff to the defendant in the case at bar were services performed in operating equipment always owned by the former. The contract herein and the proofs both establish that the machinery involved was actually operated by the plaintiff's own employees. There is not the slightest question here but that the plaintiff at all times retained the ownership of the tractor etc. As a matter of fact, he did.

Before concluding our review of the foregoing decision it should be mentioned that it seems to be suggested in defendant's answer that the equipment contract here being considered was one of lease and rental and hence subject to Price Regulation No. 134 aforesaid. That point was also urged in the Automatic Fire Alarm Company case supra and the facts there appearing would seem much stronger in support of that position and in favor of the Price Administrator than in the instant case, for the equipment there was put in place in the customer's store room. However, the Emergency Court of Appeals ruled against the Price Administrator on this contention, also, saying:

"Finally the Administrator suggests that he has authority under Sec. 302(a) of the Act to regulate the maximum prices charged for 'sales, dispositions, exchanges, leases, and other transfers' of commodities, and that the complainants transfer or dispose of their equipment to their customers when they install it in their customers' premises. But the Administrator has not sought to regulate the complainants' charges on this basis. If he should seek to do so he would be met by the fact that the complainants retain title to the equipment and also possession of it, in the sense that it is locked against manipulation by their custom-

ers, and that it remains in reality their tools of service. Under these circumstances it would be difficult to discover in these transactions a disposition or transfer within the meaning of the Act."

We have quoted at length from the case just reviewed for several reasons among them being the material and pertinent resemblance in principle involved with the case before us. Another reason is: the peculiar authority vested in the Emergency Court of Appeals which, it will be recalled, the Emergency Price Control Act itself established and determined what its powers should be.

In that connection we should necessarily call attention to the provisions of the Emergency Price Control Act (U.S.C.A. Title 50 App., Section 924(d) which reads as follows:

"The Emergency Court of Appeals, and the Supreme Court upon review of judgments and orders of the Emergency Court of Appeals, shall have exclusive jurisdiction to determine the validity of any regulation or order issued under section 2 (section 902 of this Appendix), of any price schedule effective in accordance with the provisions of section 206 (section 926 of this Appendix), and of any provision of any such regulation, order, or price schedule. Except as provided in this section, no court, Federal, State, or Territorial, shall have jurisdiction or power to consider the validity of any such regulation, order, or price schedule, or to stay, restrain, enjoin, or set aside, in whole or in part, any provision of this Act authorizing the issuance of such regulations or orders, or making effective any such price schedule, or any provision of any such regulation, order, or price schedule, or to restrain or enjoin the enforcement of any such provision." (56 Stat. Ch. 26, p. 33)

It should be especially noted under the foregoing statutory provision that the "Emergency Court of Appeals and the Supreme Court upon review of judgments and orders of the Emergency Court of Appeals shall

have *exclusive jurisdiction* to determine the validity of any regulation or order issued" under Section 902, U.S.C.A. App. above cited. It should be mentioned, too, that the judgment of the Emergency Court of Appeals in the Automatic Fire Alarm Company case was never reviewed by the Supreme Court of the United States or altered in any way so far as we are advised, consequently the force of the decision becomes increasingly apparent. The Price Administrator appears not to have at all questioned that a proper result was reached in that case. That being so, a fair and persuasive inference may readily be drawn that the Price Administrator himself considered that he was without authority to make a regulation applicable to a contract of the character here before us and accordingly Regulation No. 134 supra may not properly be invoked by the defendant as a defense to plaintiff's first cause of action. See also Cooperative Building Materials, Inc. vs. Robbins & Larkey, 80 Cal. App. 2d 832, 183 Pac. 2d 81, 85-86 infra.

But if this were not so, then there is still another view of this matter which is grounded upon the very terms of Regulation 134 aforesaid itself which leads to a similar conclusion. Section 12(9) (iii), p. 6 states that:

"Neither of the foregoing definitions embrace, nor does this regulation apply to, a situation wherein the party furnishing to or using for another party any construction or road maintenance equipment is, pursuant to the terms of a written or provable contract and according to the laws of the State where the work is to be performed, an independent contractor, liable to the other contracting party only for a particular result in respect to such work and is not subject to the control of such other party as to the means or methods by which such result is to be accomplished."

In the Robbins & Larkey case supra, the facts quite closely resemble those appearing in the case at bar.

The plaintiff corporation, Building Materials, Inc., entered into a written contract with the defendants, Robbins and Larkey, who were the principal contractors on the work proposed to be done to:

"furnish the following work and service: 1. Deliver to the job site two standard mixermobiles* and one 65-ton, 4-compartment batching plant*, and remove same at conclusion of the contract. 2. Furnish operators and fully maintain said mixermobiles and batching plant. 3. Provide laborers for emptying cement sacks into our mixermobile skips."

for a specified and agreed upon compensation. In explanation, it may be stated that:

"*A mixermobile is described as a complete truck-mounted-concrete-mixing-and-elevating equipment. It loads itself, mixes its concrete and has the ability to lift it to higher elevations in a tower which is constructed on the machine.

"A batching plant is a plant consisting of overhead compartments for the assembling of rock and sand. Directly below is a gathering hopper in which the material is weighed according to a specification, and the hopper in turn will again empty at street level into a truck for transporting it. It is a device for measuring specific aggregates in the specifications of concrete."

Defendants, Robbins and Larkey declined to pay under the terms of the contract they had executed and plaintiff sued to recover the amount asserted to be due it under that contract. The defense of Robbins and Larkey was that the compensation agreed upon was subject to Maximum Price Regulation No. 134 as pleaded in the case at bar. The contentions of the parties are thus stated by the court:

"Appellants maintain that the contract between respondent and Robbins & Larkey is within the terms of the Emergency Price Control Act of 1942, 50 U.S. C.A. Appendix, § 901 et seq., and of the regulations adopted pursuant to that Act. Respondent contends,

as found by the court, that it is an independent contractor for the performance of construction work, having agreed to furnish 'work and service' with equipment and labor for the completion of the work that it agreed to perform, and therefore the contract is not within the terms of the Price Control Act."

The defendants contended — to state their position somewhat more in detail—that the agreement of the parties constituted in effect a lease of fully operated equipment as set out in Section 2 (designated also as Section 1399.12 of Maximum Price Regulation), a contention also apparently made in the case at bar. Rejecting this contention the court said:

"The contract in question bears no resemblance to a lease. It contains no reservation of rent; the owner of the equipment, respondent, did not agree to and did not divest itself of possession; Robbins & Larkey never had possession of the equipment; no rental was specified; no term was fixed. A provision for the payment of rent (Mann v. Mann, 141 Cal. 326, 330, 74 P. 995) and of a transfer of use and possession of property to the hirer (Entremont v. Whitsell, 13 Cal. 2d 290, 297, 89 P. 2d 392) are essential elements of a lease. If the provisions of an instrument show an intention on the part of one party to dispossess himself of the property and of the other to enter and hold in subordination to the title of the first party it is a lease. Morris v. Iden, 23 Cal. App. 388, 393, 138 P. 120; Williams v. Miller, 68 Cal. 290, 293, 9 P. 166. A lease usually implies an instrument by which the exclusive possession of property is given for a limited period. Coney Island Co. v. McIntyre-Paxton Co., 6 Cir., 200 F. 901, 908; Delaware, L. & W. R. Co. v. Sanderson, 109 Pa. 583, 1 A. 394, 395, 58 Am. Rep. 743."

Relative to the plaintiff's position that it was an independent contractor the court approved that view in this language:

"Respondent was an independent contractor, liable to Robbins & Larkey 'only for a particular result' (sec.

1399.12(a) (9) (iii), to wit, the mixing of the concrete according to the specifications in the contract between Robbins & Larkey and L. F. Dow Company, Inc., which in turn was governed by the contract between the last named company and the War Department. Respondent was not subject to the control of Robbins & Larkey as to the means or methods by which the result was to be accomplished. (Id.) The contract therefore was not embraced within the definitions contained in the regulations and respondent was subject neither to the provisions of the Emergency Price Control Act nor to any of the regulations adopted pursuant thereto.

"The judicial definition of an independent contractor, as well as that contained in the regulations above quoted, includes respondent. 'An independent contractor is one who exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer except as to the result of the work. * * * A contractor, obviously, is one party to a contract or one who has contracted to do or perform certain work.' Chapman v. Edwards, 133 Cal. App. 72, 76, 24 P. 2d 211, 213."

The judgment of the trial court so holding was affirmed.

Under the facts shown by this record when tested by the rulings in our own decisions, as well, we conclude that Mr. Lichty was an independent contractor. See Fox Park Timber Company v. Baker, 53 Wyo. 467, 84 P. 2d 736; Burnett vs. Roberts, 57 Wyo. 511, 121 Pac. 2d 896.

The evidence in the case before us does not establish that defendant ever instructed the plaintiff how the machinery described in the contract of the parties should be used. Plaintiff, through its employees, exercised complete control over the means and methods of doing the work agreed to be done. Lichty employed the men who operated the equipment, selected the par-

ticular piece of equipment to be used on any piece of work, worked on any grading or excavation job defendants wished done the number of hours he chose to do so on any day, and changed the equipment as he saw fit and found to be necessary in order to advance the work more expeditiously. He was responsible to the defendant only for a particular result, i.e., excavating cellars, grading lots in the proposed addition to the City of Rawlins and doing landscaping thereon which required heavy equipment to get it completed. We think, accordingly, that defendant's defenses above discussed to be untenable and that plaintiff should recover for the work performed, of which defendants had the benefit—a fact concerning which there is no dispute. We regret we have had no brief or argument from the defendant and so have done the best we could to comprehend defendant's contentions as they appear on the record in this case.

Before concluding this opinion, it may be appropriate to observe that counsel for appellant also argues that even if the Price Control Act were to be regarded by us as applicable, the result thereby attained would differ not very greatly from the one we now reach. In view of what has hereinabove been said, however, we deem it unnecessary to consider this contention.

The judgment of the District Court denying a recovery on plaintiff's first cause of action will be reversed and the cause remanded with instructions to enter judgment in favor of the plaintiff for the amount sued for by him in that cause of action.

*Reversed and Remanded with Instructions.*

KIMBALL, J. and BLUME, J. concur.