ALLEN McKENZIE and FARRIN FRAZIER, doing
business as F & M Ready Mix Concrete Company,

*Plaintiffs and Respondents,*

vs.

NEALE CONSTRUCTION COMPANY, INC., a
Kansas Corporation,

*Defendant and Appellant.*

(No. 2700; February 28th, 1956; 294 Pac. (2d) 355)

176

For the Defendant and appellant the cause was submitted upon the brief and also oral argument of Charles M. Crowell of Casper, Wyoming.

For the plaintiffs and respondents the cause was submitted upon the brief of Mahoney & Wilkerson of Casper, Wyoming, and oral argument by Mr. Ernest Wilkerson.

178

## OPINION

BLUME, Chief Justice.

Allen McKenzie and Farrin Frazier, doing business as F & M Ready Mix Concrete Company, hereinafter referred to as plaintiffs, brought this action against Neale Construction Company, Inc., hereinafter referred to as defendant.

Plaintiffs alleged that they were residents of Casper, Wyoming, and that defendant was a Kansas corpora-

tion, authorized to do business in Wyoming; that between the dates of November 5, 1952 and February 3, 1953, defendant, through its duly constituted agent, Orvel Curns, ordered and took delivery of ready-mix concrete and chloride of the fair and reasonable market value of $2962.95 which, after crediting $1049.25 left a balance allegedly due plaintiffs from defendant of $1913.70.

Defendant answered, denying the allegations of the petition, except as to the status of the parties, and alleged that Curns was performing concrete work for the construction of sidewalks along CY Avenue in Casper as a subcontractor of the defendant who had the contract for laying telephone lines and cable necessitating the replacement of such sidewalk; that upon partial completion of such subcontract and in accordance therewith, defendant mistakenly paid to plaintiffs $1649.25, while the contract provided for joint payment to plaintiffs and Curns; that Curns failed to complete his contract and left the job; that part of the construction Curns had done was defective and was rejected; and defendant was compelled to expend $2526.89 to rectify the defalcation of Curns which was in addition to the aforementioned payment on the subcontract of $1649.25.

Plaintiffs generally denied the allegations of the answer in their reply and filed a demand for jury. The action came on for trial before the court, sitting with a jury, on November 30, 1954. Motions for a directed verdict were made by defendant at the close of the evidence of plaintiffs and at the close of all the evidence, both were overruled. The jury returned a verdict in favor of plaintiffs and against the defendant in the amount of $1913.70. Defendant filed a motion for judgment, notwithstanding the verdict, which was overruled by the court. Judgment was entered by the court. Defendant filed its motion for a new trial which was

overruled by the court upon the condition that plaintiffs file a remittitur in the amount of $600 which was done. From the judgment, the defendant has appealed to this court by direct appeal.

The facts are substantially as follows: Defendant had a contract with Mountain States Telephone and Telegraph Company to put a conduit under the sidewalks along CY Avenue in Casper. That operation necessitated the tearing up and replacing the sidewalks. Curns wanted that job and contacted McKenzie, one of the plaintiffs, to see about getting cement for it. McKenzie told Curns that plaintiffs would have to have something from defendant to the effect that defendant would pay for the concrete. Curns thereupon entered into a contract with defendant and later took the contract to McKenzie. The contract is as follows:

"This agreement entered into this 5th day of November, 1952, between Orvel Curns, Cement Finisher, Neale Construction Company, hereinafter called Owner, and represented under this contract by Neale Construction Company, shall read as follows:

"The cement finisher agrees to handle, place and finish all concrete, and set all forms required of the City of Casper for the project at Casper, Wyoming, for the sum of $3298.50. This contract is for the finishing of 15, 970 sq. ft.

"It is further agreed that the cement finisher agrees to do this work in a workmanlike manner, and unless satisfactory work is being performed, this contract shall be in force for the entire project. If work is found to be unsatisfactory, then the Owner reserves the right to cancel this contract.

"The Owner agrees to do all grading and covering of concrete if necessary. If calcium chloride is necessary, the Neale Construction agrees to pay for it at the rate of 70c per yard of concrete.

"The Neale Construction Company will pay one half of the contract price on the completion of three blocks. The Neale Construction Company shall make the pay-

ments payable to The F. & M. Ready-Mix Concrete Company and Orvel Curns jointly.

> "/s/ Orvel Curns
> Orvel Curns, Cement Finisher
> The Neale Construction Company
>
> By /s/ Edwin Westwick
> Supt. for Neale Construction Co."

Before any concrete was delivered, McKenzie had a conversation with Westwick, defendant's superintendent. McKenzie told Westwick that plaintiffs would look to defendant for payment under the contract. Some detailed facts in this connection will be mentioned later. All of the cement delivered to the sidewalk job was ordered by Curns. A log of truck deliveries of concrete was kept by plaintiffs showing when and where each load went. The log shows delivery of the cement to Curns designated as "purchaser" on the CY sidewalk. The delivery tickets show the concrete in question was delivered to Orvel Curns. No statements were signed or received by Westwick from plaintiffs, nor did defendant ever receive any invoices or billings from plaintiffs. When half of the work was completed, Curns billed the defendant for $1649.25, according to the contract. This included the amount then due the plaintiffs, as well as the amount due Curns for his part of the work. The statement for this amount was sent to the home office of defendant. The bookkeeper made out a check for the foregoing amount, but by mistake made it payable to plaintiffs instead of making it payable to the plaintiffs and to Curns jointly as provided in the foregoing contract. The check was sent to Westwick who delivered it to Curns. Curns delivered it to McKenzie. McKenzie almost sent the check back because it was not according to the agreement and might mess up plaintiff's books. McKenzie had Curns endorse the check and gave him the difference between the amount of the check and the concrete then delivered

to that time. Plaintiffs paid Curns $600 out of the check received. Curns' brother and one or two other men were employed on the sidewalk job. These men were not hired by defendant, discharged by defendant nor paid by defendant. Neither Westwick nor anyone in the employment of defendant supervised the work of Orvel Curns. Westwick was occasionally present when the concrete was delivered. His duties were grading, making ditch and laying line; he was on the front end of the job. Curns did not complete his job, but abandoned it between February 1 and 10. Part of his job was unfinished when he left and the city turned down part of the job for poor workmanship. There was a defect in the concrete furnished. It was a very poor mix. Defendant spent $2526,89, in addition to the aforementioned payment of $1649.25, to complete the contract of Orvel Curns and lost money on the job. There was money owing plaintiffs at the time Curns left for concrete furnished after the first check and Westwick so notified defendant. McKenzie talked with Westwick about this balance and Westwick said he would have to take it up with the home office in Topeka, Kansas. A few other facts will be mentioned later.

One of the main questions herein is as to whether the concrete in question was furnished to Curns in the capacity of subcontractor or as an employee or an agent of the defendant. The most vital fact in this connection is the contract between Orvel Curns and the defendant hereinbefore set out in full. Under it Curns agreed to "handle, place and finish all concrete" in connection with the work, that is to say in connection with the sidewalk hereinbefore mentioned. Counsel for the plaintiffs argue that there is nothing in the contract relative to the furnishing of the cement. It is true there is nothing to that effect in so many words, but indirectly there is. Counsel for plaintiffs further argue that a cement finisher does not normally purchase the ma-

terial. We do not know that to be true. Doubtless Curns could have been hired merely for the purpose of simply doing what counsel mention, but it is hard to see how he could place and finish the sidewalk without having the concrete to do it. One would think that ordinarily where a contract requires a man to place and finish the concrete, he would be required to also furnish the concrete in the absence of an agreement to the contrary. That would seem to be especially, or particularly true in a case like that at bar in which the contract specifies what the defendant was to furnish. The contract states that, aside from paying $3298.50 for the completed work, the defendant was to do all grading and covering of the concrete, and it would pay, evidently as extra compensation for calcium chloride at the rate of 70c per yard of concrete. Specifying what the defendant was to furnish would rather forcibly indicate that it was not to furnish anything else. Sarchet v. Roach, 62 Wyo. 97, 163 P. 2d 185. Again, if Curns were merely a finisher in the sense that counsel for plaintiffs mention, there would be no sense in connecting him with the party furnishing the cement. In such a case he would ordinarily be paid separately and the party furnishing the cement likewise. But in this case Curns is tied up with the plaintiffs. The contract specifies a lump sum of $3298.50 to be paid to Curns for the completed work he was to do. This indicates that Curns was an independent contractor. 42 A.L.R. 619; Fox Park Timber Co. v. Baker, 53 Wyo. 467, 84 P. 2d 736. The check for the work was to be payable jointly to Curns and to the party furnishing the cement. Half of it was paid. Curns billed the defendant for this amount. Out of the check the plaintiffs were paid for the cement which was furnished up to that time. This would seem to show conclusively that for and out of the compensation of $3298.50, agreed to be paid to Curns, he was to buy and furnish the concrete.

All the acts of the parties conform to this conclusion and are not consistent with anything else. Thus the concrete furnished by the plaintiffs was all delivered to Curns as the purchaser, as shown by the records of the plaintiffs and all the delivery slips for the concrete were made out to Curns. The defendant did not supervise the work. It did not hire the men to do it. It had no control over Curns while he and his men were doing the work, and that lack of control indicates that Curns was a subcontractor. Stockwell v. Morris, 46 Wyo. 1, 22 P. 2d 189; Burnett v. Roberts, 57 Wyo. 511, 111 P. 2d 895. We shall refer to this matter again later. When Allen McKenzie, one of the plaintiffs, talked to Westwick, nothing was said, as the former testified, about billing the defendant for the concrete, and one would ordinarily have expected that something would have been said in that connection if the plaintiffs actually expected the defendant to pay for the cement independently of the contract here in question. It would seem that little more needs to be said, since, if Curns ordered the concrete in the capacity of a subcontractor, he cannot be said to have ordered it in any other capacity. To order it in one capacity is inconsistent with ordering it in any other. That is not inconsistent with the rule that a man may be an employee in part of the work and a subcontractor in connection with other work. Ordinarily the main contractor is not liable for material furnished to a subcontractor because no privity of contract exists between him and the material man. 17 C.J.S. § 520, p. 1143; Board of Public Education v. Aetna Casualty & Surety Co., 4 WWHarr 355, 152 A. 600, 603; Kruse v. Wilson, 3 Cal. App. 91, 84 P. 442. In this case, however, the plaintiffs were in a measure made parties in the contract here involved. So we must proceed to consider that phase of the case.

Examining the contract in this case and the testimony of the parties, it would seem quite clear that the

plaintiffs have misconceived the nature of the transaction here involved. The relationship between plaintiffs and defendant was not that of seller and purchaser as we have already seen. The defendant was rather a guarantor in a limited sense for the defendant agreed that the payments should be made by check payable jointly to Curns and the plaintiffs. It was a guarantor to that extent. A guarantor is never the principal. The guaranty was further limited by the terms of the contract which included the fact that the contract might be ended by the default of Curns, after which no further payments were due. If plaintiffs had wanted an unconditional guaranty on the part of the defendant that the plaintiffs would be paid independently of the contract, they should have let it be known to the defendant, so that the latter could have properly protected itself as well as plaintiffs and perhaps saved itself the heavy loss ultimately incurred. But plaintiffs did not do so, and it would now be wholly unjust to defendant to adopt a different theory and let defendant take all the loss. Counsel for the plaintiffs would indeed have us understand, judging from their brief, that the guaranty was unconditional, but that is clearly wrong. The evidence herein decisively shows that the parties were relying upon the contract involved herein and upon nothing else and the plaintiffs cannot now rely upon part of the contract and repudiate the rest to the prejudice of the defendant. See 17 C.J.S. § 521, pp. 1144, 1145. Meridian Life & Trust Co. v. Eaton, 41 Ind. App. 118, 82 N.E. 480.

Thus it appears that Allen McKenzie, one of the plaintiffs, talked to Westwick before any concrete was delivered. The record shows the following testimony of Mr. McKenzie:

"Q. Did you discuss with Mr. Westwick the means of payment for the concrete to be placed on the job? A. Well, not too much, because it was already in the contract that he and Curns made out.

"Q. Did you indicate to Mr. Westwick that you would look to his company for payment *of this contract?* A. That's right. (Italics supplied.)

"Q. What did Mr. Westwick respond with regard to that? A. He said they were a reliable outfit; I could check them through the Telephone Company."

It may be noted that Westwick made no unconditional promise that defendant would pay for the concrete in any event. In fact he made no promise of any kind. But since he knew that he had signed the contract with Curns, it may be conjectured he thought that the talk was about the liability of the defendant under the contract. That the plaintiffs were thinking of the liability under the contract, and only under the contract, seems to be too clear to be questioned. That appears again in another connection. The contract provided that the check for the work should be made jointly to plaintiffs and to Curns. By mistake it was made to plaintiffs alone. The testimony in that connection by Mr. Frazier is as follows:

"Q. And you knew the payments were to be made on the contract to both Curns and yourself jointly? Is that right? A. That's right.

"Q. So when you say that this check was payment for concrete, what you meant was that it was a payment on the contract out of which you were to receive some of your money for concrete. Is that right? A. You might say that."

Mr. McKenzie testified to the same matter stating:

"I came pretty near having the check sent back. I said, 'The check is not made according to the agreement'." Thus it appears to be clear that both parties relied on the contract. Plaintiffs, as already stated, could not well rely on part of it and repudiate the rest, namely when the contract ended because of the default of Curns, and no further payments were due thereon.

It appears that plaintiffs made injuiry of the Telephone Company as to the financial standing of the defendant. Their counsel ask why plaintiffs should do that if they did not depend on the defendant for payment of the concrete. Why that was done is very clear. Plaintiffs did not have confidence in Curns. So it was perfectly natural that they should want to find out whether they could have greater confidence in the defendant who had signed the contract with Curns. There is not the slightest indication in this that plaintiffs expected any payment other than that mentioned in the contract and under the conditions mentioned therein. The truth, of course, is that neither the plaintiffs nor the defendant expected that Curns would default in his contract, and both accordingly incurred a loss. Counsel for plaintiffs contend that it would be unrealistic for plaintiffs to lose money because of Curns' default. But it would be no less so for the defendant. Both sides thought they were fully protected; both found that to be untrue; both lost money.

Counsel for plaintiffs claim that the case at bar comes within the rule of Malloy v. Fong, 37 Cal. 2d 356, 232 P. 2d 241. In their brief counsel say the court in that case held that: "The power of the principal to terminate the services of the, agent is the right to control the agent's activities inasmuch as a right to immediate discharge involves control, and such right to terminate employment is the primary indicium of an agency or employee relationship as against an independent contract." And counsel say that defendant "had the right to terminate Mr. Curns' employment at any time it considered his work unsatisfactory." That statement is inaccurate. The contract provides that: "If work is found to be unsatisfactory, then the Owner reserves the right to cancel this contract." That is far from saying that defendant could discharge Curns at any time. Defendant could not act arbitrarily.

It could terminate the contract only if the work was in fact unsatisfactory, and that was not controlled by the mere whim of defendant. It would be a strange doctrine that a party could not reserve the right to cancel a contract if the work is in fact unsatisfactory, and by canceling the contract in such event, the subcontractor would thereby immediately be transformed into an employee or agent. If that were the rule, contractors would not create many subcontractors. The danger in doing so would be too great. In the case at bar as heretofore stated, the defendant did not supervise the work of Curns. It had no control over him at all in doing the work, indicating that Curns was a subcontractor. The fact that Curns' contract might be terminated if the work was unsatisfactory, is a different matter from controlling Curns' activities while he was doing the work. Malloy v. Fong, supra.

The fact that Westwick notified the defendant when Curns quit that some of the cement furnished remained unpaid, that Westwick never had had a subcontractor for 27 years, that he did not deny liability of defendant for the unpaid cement but merely referred the plaintiffs to the home office of the defendant, does not, we think, have any particular bearing in this case as showing that Curns was not a subcontractor, or that defendant was liable for anything more than the amount contemplated in the contract. Again it is said that there is an amount still due under the contract here in question. We are unable to see that. Curns quit, did not finish his work and the defendant had to complete the work at the cost of $2526.89, which constituted a considerable loss. Surely under those circumstances there could not be anything further due under the contract. Counsel for plaintiffs say: "Where an agent is authorized and directed to purchase goods and material for the principal and on the principal's account but is not furnished with money to pay cash for

the merchandise, there is an implied right on the part of the agent to charge the merchandise to the credit of the principal. Restatement Law of Agency, Sec. 65." We are unable to see what that rule has to do with this case. For it to apply it must be shown that the agent is authorized to buy the merchandise on behalf of the principal. That has not been shown herein.

In short, there is no conflict in the testimony. It is all one-sided. We fail to find any testimony in the record showing that defendant is liable for anything more that what has already been paid.

The judgment herein must be reversed. We see no good purpose of retrying the case, and the trial court is accordingly directed to enter judgment for the defendant.

*Reversed.*

HARNSBERGER, J., and PARKER, J., concur.