## FARMERS' STATE BANK v. NORTHERN TRUST CO., ET AL.

(No. 1465; September 11, 1928; 270 Pac. 163)

*A. C. Allen* and *O. N. Gibson,* for appellants.

48

*Corthell, McCullough & Corthell,* and *H. C. Brome,* for respondents.

BLUME, Chief Justice.

This is an action to cancel a certain guaranty agreement signed by E. H. Luikart and Oscar W. Nicholson, and to declare their rights and those of plaintiff bank arising out of that transaction and related ones. The court refused plaintiffs any relief and dismissed the petition. From this judgment an appeal has been taken to this court.

The only point argued is the failure of the court to cancel the guaranty agreement hereinafter mentioned. The Farmers State Bank of Riverton, one of plaintiffs in the court below, will be referred to herein as the "Bank;" the Northern Trust Company, defendant, as the "Trust Company;" the Investors Guaranty Corporation, defendant, as the "Guaranty Corporation." Only the salient facts will be set forth.

The Guaranty Company is an investment company and at one time owned the Bank, a banking institution at Riverton, Wyoming, but was separated from the latter in June, 1921, at which time the plaintiff Nicholson bought all of the capital stock of the Bank, later, in September, 1921, transferring half of it to the plaintiff Luikart. When this sale of the capital stock to Nicholson was made, certain notes then held by the Bank were guaranteed by the Guaranty Company, as mentioned more fully in the case of Farmers State Bank v. Haun, et al., 30 Wyo. 322, 222 Pac. 45; 31 Wyo. 201, 224 Pac. 856. In the spring and summer of 1922 suits were instituted by the Bank against the Guaranty Corporation upon this guaranty. The suits were aided by attachment levied upon the lands of the Guaranty Corporation in Fremont County, Wyoming. Among the lands levied on were about 1000 acres, known as the Earle-Glennie ranch, which will be again referred to later. These suits involved close to $100,000. Judgments were duly recovered therein, in about the amount just stated.

Prior to June, 1921, the Guaranty Corporation had made a loan of about $55,000 to one Souter, secured by a mortgage on livestock and real estate in Fremont County, Wyoming. This loan was negotiated and sold to the Trust Company, a banking institution in Chicago, Illinois, the payment of the loan being guaranteed by the Guaranty Corporation. The Bank also held a further loan made to the same Souter in the sum of about $10,000. Neither of these loans were adequately secured. The

Trust Company further held a note of the Guaranty Corporation for $17,400. Becoming dissatisfied with the condition of the Souter loan held by it, and of the Guaranty Corporation note above mentioned, the Trust Company sought to strengthen its security and through the defendant Cuscaden, its vice president, arranged for a conference, to be held in Cheyenne, Wyoming, with the principal stock-holders of the Guaranty Corporation and other interested parties. The conference met in the latter part of May, 1922. Cuscaden represented the Trust Company; McNish and one Kingery represented the Guaranty Corporation, the former also speaking for defendants Keating and Rohlff; Luikart and Nicholson represented themselves and the Bank. The latter was interested only indirectly and merely because the Trust Company was its correspondent in Chicago and had borrowed money from it from time to time upon negotiable paper. Nor were Nicholson or Luikart, or for that matter, the other persons, legally responsible for the notes held by the Trust Company. But Cuscaden desired all of the persons mentioned, excepting himself, to guaranty this indebtedness, because of their connection, past or present, with the Guaranty Corporation, proposing to extend the time of payment for three years. Kingery refused to sign such guaranty. The outcome of the conference was that McNish, Keating, Rohlff, Luikart and Nicholson agreed to sign the guaranty, which they subsequently did. As part of the transaction it was agreed that the Bank should release its lien upon the Earle-Glennie ranch; that the same should be conveyed to Cuscaden, to be held by him, or his successor, in trust for the benefit of the individuals signing the guaranty-agreement; that the Trust Company should take over from the Bank the Souter loan of about $10,000 held by it, and to make a loan of about $4,000 to the Guaranty Corporation for the purpose of paying taxes on the lands, and, perhaps, for other purposes. These matters were carried out. The guaranty was evidenced in writing, recites

the amounts just mentioned, namely the two Souter loans, the note of the Guaranty Corporation of $17,400, and the additional loan of $4,000, and then continues:

"Now, therefore, in consideration of the premises and in further consideration of One ($1) dollar in hand paid, the receipt of which is hereby acknowledged, the undersigned, each to the extent of one-fifth of the entire amount involved guarantee to The Northern Trust Company that all of the above indebtedness, together with interest thereon, will be fully paid within three years from this date and if any of such indebtedness is not paid within such time then each of the undersigned agree to pay to said The Northern Trust Company one-fifth of the balance thereof. During said period of three years The Northern Trust Company may make such renewals of said indebtedness or any of it from time to time that it thinks best without notice to or consent of any of the undersigned and further may make substitution of collateral from time to time or may sell the collateral or take any action that it thinks wise in and about said indebtedness, provided the same is approved by a majority of the undersigned, and in case all of the collateral is sold prior to the expiration of the three year period above mentioned and sufficient funds are not realized thereby to pay the indebtedness of The Northern Trust Company in full, then immediately upon the sale of said collateral and the ascertainment of the balance due The Northern Trust Company the undersigned shall each pay immediately one-fifth of said balance."

To induce Luikart and Nicholson to sign the guaranty and to cause the Bank to release its lien on the Earle-Glennie ranch, it was further agreed that the Trust Company should extend a "line of credit" to the Bank by discounting bankable notes sent by the latter, in an amount of $40,000 to $50,000 outstanding at any one time. This agreement was carried out until January 1, 1924, or shortly previous thereto, and no complaint exists as to that period. In the fall of 1923, however, the Bank received notice that the Trust Company would, commencing with January, 1924, adopt a different policy from that previous-

ly followed, accepting only notes for discount which were guaranteed by the discounting bank, and not, as theretofore, notes guaranteed only by individuals, claiming that the latter method theretofore pursued was fraught with dangers—a danger mentioned by this court in the case of Webb v. Cash, 35 Wyo. 398. A number of letters were interchanged between the Bank and the Trust Company, the net result of which was that the Trust Company claimed that the Bank could not, under its charter, and in view of its capital stock, guarantee, and hence discount, more than $25,000 outstanding at any one time, and that in view of the fact that the Bank had also a correspondent in Omaha, the Trust Company would not accept more than one-half, namely, $12,500, of the notes which the Bank was able to discount under the new method adopted by the Trust Company. Counsel for appellants claim that this attitude was equivalent to a repudiation of the agreement made in Cheyenne in May, 1922, and the claim is made that the "line of credit" of $40,000 to $50,000 was to last for the period of three years, the time for which the payment of the Souter loan was extended, or as long as that indebtedness was unpaid and outstanding. The contention may be disposed of by considering the testimony as to the duration of the "line of credit."

The witness Luikart testified that Cuscaden "agreed to let us have an additional amount of (credit of) $40,000, which would be concurrent and run at least as long as the guaranty of the Souter paper, or as long as that paper was unpaid and outstanding." The witness Nicholson stated that no time during which the "line of credit" should be extended was mentioned. Cuscaden testified that it was held out to him that the bank

"would need some money over the year, over the year's turn, over the fall, winter and spring, over into the next fall until the crop was harvested, or something; wanted to know if the Northern Trust Company wouldn't extend

them a line of credit. I told them yes, that we would see them over the year up to $40,000. I think a larger amount was suggested, but it was too large for me, and I suggested I think, $40,000. I don't recollect whether that was in addition to what was held, but that figure sticks out in my mind of $40,000, which I said we would go over the year.''

Again on cross examination he stated:

''Q. Now in this private conference, when you and Mr. Nicholson were discussing the credit which was to be extended, what was said there about the length of time which this credit was to be extended? A. According to my recollection, no particular length of time was talked about. The conversation was directed along the line of the bank out there needing some help over the year; that they were hard up, that they needed a line of credit to see them through over the next year—to the next year. Q. Was it to the next year or through the next year? A. Over the seasonal swing, through a year or a year and a half. Q. What is a seasonal swing? A. Depends on the arrangement. Q. Define what you mean by running over a year's time; more than a year or less? A. A year or thereabouts.''

Mr. Kingery testified that this line of credit was to be extended in the approximate sum of $50,000 through the summer and fall and into the next spring, and that Luikart and Nicholson agreed to join in the guaranty for this consideration.

Counsel for appellants claim that the testimony of Nicholson and Cuscaden was in accord, both of them stating that no definite time during which the line of credit of $40,000 or $50,000 should be extended was mentioned and that, accordingly, aside from the testimony of Luikart, the necessary inference must follow that it was to be extended throughout the time that the guaranty on the Souter paper was in force. We cannot agree with that contention. We cannot, in fact, see how the testimony of Cuscaden can at all be misunderstood. It was clearly to the effect that it was not to last over a year and a half, and it is not disputed that the agreement was fully carried

out during that time. The trial court had a right, of course, to accept this testimony, and we cannot interfere with its doing so. Further, Cuscaden was fully corroborated by Kingery, and the fact that his testimony was given by deposition does not, in view of the fact that Cuscaden testified in the presence of the trial court, alter the rule that we cannot interfere with the finding of the trial court where, as here, its finding is sustained by substantial testimony. Sims v. Surety Co., (Wyo.) 265 Pac. 450.

2. Counsel for appellants argue a second reason why the guaranty-agreement should have been cancelled by the court. On November 15, 1923, the Trust Company instituted suit against the Guaranty Corporation in the District Court of Fremont County, to recover judgment for a portion of the indebtedness guaranteed as above mentioned, presumably on the item of $17,500. The Guaranty Corporation filed answer on the same day confessing the correctness of the amount for which recovery was sought, and judgment was rendered in the cause on the same day in the sum of $21,157.51. It was stated in the petition that this was done pursuant to a conspiracy between the Trust Company and the Guaranty Corporation to obtain a priority over the unmatured claims of the bank against the Guaranty Corporation and to hinder and delay it in the enforcement of such claims. No testimony of any conspiracy was introduced. But it is claimed that this action on the part of the Trust Company violated the guaranty agreement above mentioned; that the bank had still some claims against the Guaranty Corporation which were not secured, and that the judgment in favor of the Trust Company, constituting a lien against all the property of the Guaranty Corporation, hindered the Bank from enforcing these unsecured claims and damaging it in that respect, and that this is sufficient ground for cancelling the guaranty agreement so far as Nicholson and Luikart are concerned. It is assumed, though the Bank

was not a party to the guaranty agreement, that, nevertheless, Nicholson and Luikart may complain of the damages caused to the bank, the same as though they were caused to them individually. No authority to this effect is cited, but we may assume, for the purposes of this case, that this position is correct, and still must come to the conclusion that the judgment of the trial court cannot be disturbed on this point. The right of rescission and cancellation is not an absolute right and rests in the sound discretion of the court, and that discretion should be exercised with caution so that no material injustice will be produced by granting cancellation. 9 C. J. 1161. And the general rule is well settled that in the absence of some independent ground of equitable jurisdiction, the relief of rescission and cancellation will not, with some possible exceptions not applicable here, be granted for a mere breach of contract, at least where there is an adequate remedy at law for damages, and the burden to prove the inadequacy of the remedy at law rests upon the party asking the concellation. 9. C. J. 1181; 4 R. C. L. 491; Howerton v. Kansas Natural Gas Co., 82 Kans. 367, 108 Pac. 813; 34 L. R. A. (N. S.) 46. We can see no force in the contention herein that the remedy at law would be inadequate in the case at bar. If the Bank has in fact been damaged because of the judgment obtained by the Trust Company against the Guaranty Corporation, we can see no special reason why that damage cannot be measured in dollars and cents. At least no adequate ground to the contrary has been pointed out. Again, the damage, if any, must be of a substantial kind. The court in Callahan v. Keeseville, etc. R. Co., 199 N. Y. 268, 284, 92 N. E. 747, 752, speaking of the right of rescission and cancellation, said:

"It is not permitted for a slight, casual or technical breach, but, as a general rule, only for such as are material and wilful, or if not wilful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract."

See also Haydon v. R. Co., 222 Mo. 136, 121 S. W. 15.

In the case at bar, it has not been shown that the breach, if any, was wilful, or that it was of a substantial kind. Judging from the record, it was but technical in its character, for the Bank had attached all of the property of the Guaranty Corporation and its liens were all prior to the lien of the judgment of the Trust Company. It is not unlikely that all the resources of the Guaranty Corporation were exhausted to satisfy those attachment liens. At least nothing to the contrary has been shown. Counsel for appellants say that damages should be presumed from the breach. Even if that is true, we do not see how we are warranted in carrying the presumption still further, and to the extent of presuming that the damages were of such substantial character as to authorize a court to cancel the guaranty agreement, and no authority to that effect has been cited. See 9 C. J. 1251.

Several other reasons are discussed by counsel for respondents, for instance, that the action of the Trust Company now under discussion was in no way forbidden by the Guaranty agreement and did not require the consent of the majority of the signers, but that under the doctrine of *ejusdem generis* only action similar to substitution or sale of collateral required such consent, and further that it does not appear that a majority of the signers did not consent to this action of the Trust Company and that the burden to prove the absence of such consent was on the plaintiffs. But in view of what we have said it is unnecessary to consider these points, or the further point that the appellants have derived a material benefit, and that the parties cannot be put back into their former position. Sufficient has been stated, we think, to show that the judgment of the trial court was right and should not be disturbed. It is accordingly affirmed.

*Affirmed.*

KIMBALL and RINER, JJ., concur.