**BHP PETROLEUM COMPANY, INC.,**
Appellant (Defendant),

v.

**Margaret Daniel OKIE and Bill Daniel,**
Appellees (Plaintiffs).

No. 91–14.

Supreme Court of Wyoming.

Aug. 28, 1992.

Rehearing Denied Oct. 13, 1992.

Lawrence A. Yonkee and Tom C. Toner of Redle, Yonkee & Toner, Sheridan, Neil J. Short, Casper, and Paul F. Hultin and David A. Bailey of Parcel, Mauro, Hultin & Spaanstra, P.C., Denver, Colo., for appellant.

J.N. Murdock and Mark W. Gifford of Reeves, Murdock, Lewis & Gifford, and Houston G. Williams of Williams, Porter, Day & Neville, Casper, for appellees.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT * and GOLDEN, JJ.

MACY, Chief Justice.

Appellant BHP Petroleum Company, Inc. appeals from the lower court's judgment and decree ordering BHP to pay a "differential royalty" out of production from the Bighorn 2–3 well as a remedy for its breach of a contract with Appellee Margaret Daniel Okie.[1]

We reverse.

BHP raises the following issues:

1. Did the District Court fail to make findings and conclusions on the issue of the appropriate remedy as required by W.R.C.P. 52(a)?

2. May the contracts be partially rescinded?

3. Were the elements required for rescission proven by the Plaintiffs?

4. By ordering payment of a "differential royalty" has the court rewritten the contract between the parties?

5. Does this "differential royalty" constitute an impermissible penalty and a forfeiture of BHP property?

6. Are the conclusions that BHP's conduct constituted a bad faith breach of the contract clearly erroneous?

7. Is the decree awarding a "differential royalty" based on the exercise of a sound discretion?

This controversy concerns the breach of an agreement between Mrs. Okie and BHP, the unit operator of the Madden Deep Unit, a federal oil and gas unit located in Fremont and Natrona Counties, Wyoming. In 1970, Mrs. Okie committed her minerals to the Madden Deep Unit in exchange for a unique consent agreement giving her, among other things, the right to participate in decisions affecting development of the unit. The agreement worked satisfactorily for both Mrs. Okie and a succession of unit operators until June 1988 when BHP failed to inform Mrs. Okie that it was proposing a 4,000–acre participating area[2] around the Bighorn 2–3 well rather than the 2,560–acre area Mrs. Okie expected.[3]

An increase in the participating area acreage from 2,560 acres to 4,000 acres would have significant monetary repercussions for both Mrs. Okie and BHP. Although disputed at trial and perhaps oversimplified here, an increase in the participating area's acreage would mean fewer wells to drill because a single well would cover a larger area.[4] If an additional well did not have to be drilled, BHP could conceivably save its approximately 9.2 percent share of the drilling costs or almost $2 million on a well costing $20 million to drill.

---

* Chief Justice at time of oral argument.

1. The combined mineral interests of Mrs. Okie and her nephew, Appellee Bill Daniel, are referred to as simply Mrs. Okie's interests.

2. A participating area within the unit represents an area known or reasonably estimated to be productive in oil and gas in paying quantities.

3. The Bighorn 2–3 well was a massive undertaking, costing $19.8 million and requiring more than a year to drill to a depth of over 24,000 feet. The well is presently shut in because the gas is "sour." A plant must still be built at an estimated cost of $40 million to remove the hydrogen sulfide.

4. At trial, BHP argued that a larger participating area does not necessarily mean fewer wells because additional in-fill wells may be necessary to completely drain the reservoir.

On the other hand, a larger participating area would dilute Mrs. Okie's unit royalty percentage. For Mrs. Okie, using today's gas prices, a 2,560–acre participating area would have meant estimated annual royalty payments of $226,000, whereas a 4,000–acre participating area would result in projected annual payments of $215,000, or a difference of $11,000 per year.

In May 1988, the Bighorn 2–3 well had been completed, and initial well pressure tests indicated that it would be a prodigious gas producer. Mrs. Okie and other interested parties understood that a 2,560–acre participating area would be used for the well. However, on the basis of the encouraging well test results, Gil Kutchins, a representative of one of the larger working interests, approached the Bureau of Land Management about using a 4,000–acre participating area. Darryl Watts, the BLM's petroleum engineer for the Rawlins district, indicated that he would be receptive to a 4,000–acre participating area.

Acting upon Watts' positive response, Kutchins suggested to Patrick Martin, a land manager for BHP, that BHP should move quickly to apply for the larger participating area because Watts was to be transferred shortly and the incoming engineer might not be as "reasonable." In early June, Martin telephoned Watts and obtained assurances that Watts would review the application for a 4,000–acre participating area before he transferred from the BLM's Rawlins office on July 5th. In a facsimile transmitted on June 22nd, BHP notified the working interest owners of its intent to apply for a 4,000–acre participating area and explained that the application was being expedited so as to secure approval before Watts' departure. This facsimile was not transmitted to either Mrs. Okie or her representatives, nor were they informed in any other manner of BHP's decision to apply for a 4,000–acre participating area prior to BHP actually filing the application.

On June 24, 1988, BHP submitted the formal 4,000–acre application to the BLM's office in Rawlins and sent a copy of the application to Mrs. Okie's representatives. On July 6th, the BLM's district office approved BHP's application. Mrs. Okie appealed the approval of the 4,000–acre area to the state director of the BLM who ordered the district office to reconsider its approval. The district office reaffirmed its initial approval, whereupon, in a second appeal, the state director found no justification for the 4,000–acre area and ordered the district office to amend its original decision to require a 2,560–acre participating area.

Two days before the state director made his final decision, Mrs. Okie brought this suit, alleging that BHP breached the consent agreement by not allowing her to participate in the proposal to enlarge the participating area. In her complaint, Mrs. Okie sought damages and declaratory relief, declaring that her proceeds of production from the Bighorn 2–3 well should be apportioned on a lease basis rather than on a unit royalty percentage. At the pretrial conference, Mrs. Okie waived her claim for damages.[5]

The trial court agreed with Mrs. Okie, finding that BHP had materially breached the agreement in bad faith and that Mrs. Okie was entitled to equitable relief. In its decree, the district court granted Mrs. Okie a "differential royalty" to "be computed by taking the difference between six and one-quarter percent (6.25%) ('lease royalty') of the value of all production from ... the Bighorn 2–3 well ... and that royalty otherwise paid to the Plaintiffs under the Unit Agreement for production from such well ('unit royalty')." The decree also restored BHP to its position prior to its June 1988 breach by allowing BHP to retain a portion of the well drilling costs for the Bighorn 2–3 well before making any differential royalty payments to Mrs. Okie.

**5.** The pretrial conference order describes Mrs. Okie's waiver as a withdrawal of certain causes of action. Whether her action is labeled as a withdrawal or as a waiver, it is clear that Mrs. Okie initially sought damages in her complaint but abandoned her claim for damages shortly before trial. Since the Wyoming Rules of Civil Procedure entitled Mrs. Okie to seek equitable and legal relief in the alternative, it is unclear why she chose to waive her damages claim.

The precise monetary impact of the lower court's decree cannot be determined because gas prices fluctuate, actual production is unknown, and the well will remain shut in until a plant is built to remove the hydrogen sulfide. Although somewhat speculative, BHP, using relatively conservative figures, calculated Mrs. Okie's royalty payments under the decree. As already discussed, Mrs. Okie's annual unit royalty payment for a 2,560–acre participating area would be about $226,000. If Mrs. Okie were paid on a lease basis, she would receive approximately $570,000 in annual royalty payments. This additional $344,000 per year ($570,000 minus $226,000) would be paid by BHP.

On appeal, BHP does not question the lower court's finding that it breached the agreement. Instead, BHP's arguments address whether the lower court's remedy was proper and whether BHP's breach was in bad faith. Therefore, our analysis is premised upon the assumption that BHP did breach the agreement.

■ The lower court found that Mrs. Okie was "entitled to equitable relief as a result of the breach of contract." The court's findings of fact and conclusions of law do not specify what type of equitable relief was being granted. Both parties appear to view the relief as a partial rescission. Whether the equitable relief granted was a rescission, partial rescission, or some other equitable remedy, a basic tenet of equitable relief is that Mrs. Okie must, as a threshold matter, show that she had no adequate remedy at law. *Farmers' State Bank v. Northern Trust Co.*, 39 Wyo. 46, 270 P. 163 (1928); *Knaebel v. Heiner*, 663 P.2d 551 (Alaska 1983).

Mrs. Okie offers several reasons why she had no adequate remedy at law for BHP's breach. First, she contends that merely awarding the costs of her administrative appeal to her would not be adequate compensation because, even without the consent agreement, she had the right to pursue an administrative review of the BLM's decision. Second, she claims that the agreement had an intangible uniqueness which could not be bought in the market-place and was a substantial loss which could not be adequately compensated for except through equitable relief. Finally, she argues that, given BHP's repeated breaches of the agreement, it would be likely that she will be forced to bring multiple suits to effectuate her legal remedy.

■ Generally, the legal remedy for a breach of contract is the award of damages designed to place the plaintiff in the same position in which he would have been had the contract been fully performed, less proper deductions. *Robert W. Anderson Housewrecking and Excavating, Inc. v. Board of Trustees, School District No. 25, Fremont County, Wyoming*, 681 P.2d 1326 (Wyo.1984); *Panhandle Eastern Pipe Line Company v. Smith*, 637 P.2d 1020 (Wyo.1981). We fail to understand why receiving damages would not place Mrs. Okie in the same position she would have been in had the agreement been fully performed.

Our position is reinforced by the trial testimony of Mrs. Okie's nephew, Appellee Bill Daniel:

Q. Okay. My question to you, Mr. Daniel, is after the time you had submitted your comments and had met with the personnel at the Bureau of Land Management, had made your views known to them concerning your interpretation of data about the size of the PA for the Big Horn 2–3, how were you harmed?

A. The data that was not given to us in a timely fashion to allow us to get to the regulator before he made his decision resulted in us being harmed in having to go through the appeals.

Q. So that's your harm? You had to go through the appeals?

A. That's part of the harm, yes.

Q. What else? How else have you been harmed?

A. Well, as far as this application is concerned, we have not received—we didn't receive any information prior to its submission so we could be part of that process before the decision was made, and that's definitely a harm.

Q. Okay. Now, you got the result that you wanted in the first instance, did you not?

A. We did.

Q. You got the 2560?

A. We did.

Q. Okay. My question to you: Other than the costs associated with these appeals, how have you been harmed?

A. I think the main way we've been harmed is that Mrs. Okie's consent agreement no longer has the same interpretation by the operator that it did prior to the 24th day of June, 1988.

Q. Well, the agreement hasn't changed, has it?

A. No.

If BHP's breach of the agreement forced Mrs. Okie to appeal the decision of the BLM's district office, she could recover the costs of an appeal plus any sums expended for technical assistance. In her brief, Mrs. Okie claims that recovering the costs of her appeal was no remedy because, even without the agreement, she had a right to pursue an administrative appeal. It was true that she had a right to pursue an administrative appeal regardless of the agreement, but without the agreement Mrs. Okie would not be able to recover for having to appeal the decision of the BLM's district office. Thus, by recovering the costs of her appeal, Mrs. Okie would be compensated for the breach of her agreement.

Mrs. Okie's claim that damages for the loss of such a unique agreement would be speculative and could not adequately compensate her must also fail. Mrs. Okie's own expert witness testified at trial that having the consent agreement enhanced Mrs. Okie's mineral interests by five to ten percent. If BHP's breach meant a loss in the agreement's value, Mrs. Okie could show the monetary value of her loss through similar expert testimony and recover that amount from BHP.

Mrs. Okie's final claim, that she will have to bring subsequent lawsuits to enforce the agreement, assumes that the agreement will not be complied with in the future. To support this assumption, Mrs. Okie points out that, on two occasions after the June 1988 breach, BHP again breached the agreement. First, in July 1989, BHP applied for an 8,500–acre participating area, sending Mrs. Okie's representatives a copy of the application just ten days before it was submitted to the BLM. Second, in April 1990, Mrs. Okie's representatives were denied access to a working interest owners' meeting.

Evidence of these subsequent breaches was contested at trial and on appeal because the breaches were never included in the complaint or added by amendment. However, for the sake of argument, we will assume that BHP continued to breach the agreement after Mrs. Okie initiated this suit. When a plaintiff will have to repeatedly bring suit to effectuate his legal remedy, equity may provide relief. DAN B. DOBBS, HANDBOOK ON THE LAW OF REMEDIES §§ 2.5 and 5.6 (1973). The problem with this argument is that BHP ceased to be the operator of the Madden Deep Unit on October 1, 1990. No evidence exists to indicate that the new operator will not fully comply with the agreement. If Mrs. Okie will not be forced to repeatedly sue to enforce the agreement, the award of damages should be an adequate remedy for BHP's breach.

Mrs. Okie was entitled to receive damages for BHP's breach of the agreement; however, at the pretrial conference she chose to waive any claim for damages. Whatever Mrs. Okie's motivations were in waiving her claim for damages, she realized that it would be a calculated risk which, unfortunately for her, now means that she cannot recover for BHP's breach.

Our holding that Mrs. Okie had an adequate remedy at law is dispositive of the remaining issues raised by BHP.

Reversed.

URBIGKIT, J., filed an opinion concurring in the result in which GOLDEN, J., joined.

CARDINE, J., filed an opinion concurring in part and dissenting in part.

URBIGKIT, Justice, concurring in the result, in which GOLDEN, Justice, joins.

The district court, after a thoroughly developed case had been prepared by extensive discovery and followed by a comprehensive and extended trial, entered findings of facts and conclusions of law in ninety-three enumerated sections, all preparatory to the entry of the judgment from which this appeal is taken. The historical facts related in the findings are, in general, not challenged by appellees in this appeal.

After factually finding that there had been variant violations of contractual rights of appellees Mrs. Okie and Mr. Daniel as royalty interest owners by appellant BHP Petroleum as unit operator, the district court continued in its findings:

80. Mrs. Okie and Daniel have incurred expenses and expended considerable effort in protecting their expectancies under the Consent. Those include the charges for professional services of Mr. Guess, Mr. Parks and Dr. Stinson. In addition, Mrs. Okie and Daniel have suffered a loss in the value of their royalty interests as a result of BHP's actions. That loss will not be restored with BHP's future adherence to the terms of the Consent.

81. The actions of BHP in not allowing plaintiffs to attend working interest owners' meeting or to provide adequate notice of proposals made to the BLM were in direct violation of the Consent Agreement and were done in bad faith.

82. While the Consent is an Oil and Gas Agreement, the usual and general rules of construction apply to it. In construing the Consent, the cardinal principle is to ascertain the intent of the parties as exhibited in the language that the parties have used. The Consent Agreement in this case is unambiguous and the language of the Agreement controls the intent of the parties.

83. The intent of the parties as expressed in the Consent, is to provide Mrs. Okie with an opportunity to participate in proposals which affect her interests before decisions are made on those issues by an administrative authority. The Consent requires that Mrs. Okie be provided with an opportunity to present her objections, recommendations and additions to any plan of development or participating area application before an actual decision is made by the administrative authority. This intent is clearly provided in the third sentence of paragraph 7 wherein it is contemplated that no administrative decisions will be made until Mrs. Okie, after 15 days, has had an opportunity to present her objections and recommendations to the Supervisor who will then submit the question for decision to the Director of the USGS. Although the BLM has replaced the USGS as the appropriate administrator, that substitution does not displace the intent of the parties.

84. Based upon the relations of the parties, the course of negotiations and subsequent course of conduct between Mrs. Okie and the operator in applying the Consent, the following intent is established:

a. The plaintiffs were to be advised of those participating area applications which affected their interests before the proposed participating area was considered by the USGS or BLM.

b. The plaintiffs were to be given a reasonable opportunity to participate in the formulation of proposed participating area applications affecting their interests before the proposed participating area was considered by the USGS or BLM.

c. The plaintiffs were to be given access to all relevant information that was used or useable in the proposed participating area application affecting their interests before the proposed participating area was considered by the USGS or BLM.

d. The plaintiffs were to be given a reasonable opportunity to provide the operator with their objections or recommendations to the proposed participating area application affecting their lands before the proposed participating area was considered by the USGS or BLM.

e. The plaintiffs' recommendations and objections, if any, were to be given *bona fide* consideration by the operator before the proposed participating area was considered by the USGS or BLM.

f. The plaintiffs were to be permitted a reasonable opportunity to present their

objections, recommendations or additions to any formal participating area application that was made to the USGS or BLM.

g. The operator was not to oppose the plaintiffs' submission of objections, recommendations and additions, either directly or indirectly.

h. The plaintiffs were to be given a minimum of 15 days to prepare and present any objections, additions or recommendations, to the USGS or BLM regardless of whether that time was provided before or after the formal participating area application was submitted to the USGS or BLM.

i. The plaintiffs were to be advised of any participating area proposals affecting their interests, whether written or oral, made by the operator to any working interest owner.

j. The plaintiffs were to be advised of any participating area proposals affecting their interests, whether written or oral, made by the operator to the USGS or BLM.

k. With regard to any operating proposal pertaining to the development or non-development of portions of the unit area containing lands or interests owned by plaintiffs ("Operating Proposal"), plaintiffs were to be advised of such proposals made to any working interest owners, regardless of whether the proposal was in writing or simply conveyed orally.

l. With regard to Operating Proposals, the plaintiffs were to be advised of such proposals before the subject of the proposals was considered by the USGS or BLM.

m. With regard to Operating Proposals, the plaintiffs were to be given a reasonable opportunity to participate in the formulation of the those proposals before the subject of those proposals was considered by the USGS or BLM.

n. With regard to Operating Proposals, the plaintiffs were to be given a reasonable opportunity to participate in the formulation of those proposals before the subject of those proposals was finally decided by the working interest owners.

o. With regard to Operating Proposals, the plaintiffs were to be given access to all relevant information that was used or useable in the Operating Proposal.

p. The plaintiffs were to be given a reasonable opportunity to provide the operator with objections or recommendations to the Operating Proposal before the subject of the Operating Proposal was considered by the USGS or BLM.

q. The plaintiffs were to be given a reasonable opportunity to provide the operator with objections or recommendations to the Operating Proposal before the subject of the Operating Proposal was decided by the working interest owners.

r. The plaintiffs['] recommendations and objections, if any, were to be given *bona fide* consideration by the operator before the subject of the Operating Proposal was considered by the BLM or USGS.

s. The plaintiffs['] recommendations and objections, if any, were to be given *bona fide* consideration by the operator before the subject of the Operating Proposal was finally decided by the working interest owners.

t. The plaintiffs were to be permitted the opportunity to present their objections, recommendations and additions to any formal Operating Proposal made to the USGS or BLM.

u. With regard to Operating Proposals, the operator was not to oppose directly or indirectly plaintiffs' submission of its objections, recommendations and additions to the USGS or BLM.

v. The plaintiffs were given the right to attend any technical meeting or working interest owner meeting at which Operating Proposals were discussed or decisions might be made.

w. The plaintiffs were given the right to attend any technical meeting or working interest owner meeting at which any participating area application affecting their interests was discussed or decisions might be made.

85. BHP's actions through June 24, 1988 concerning the 4,000 acre Application constitute a breach of the Consent.

86. BHP's breach in that regard was a substantial and material one. *Cheyenne Mining and Uranium Co. v. Federal Resources Corp.*, [694 P.2d 65], *supra* at 73–75 (Wyo.1985) and Restatement of Contracts, Second, Section 241, at p. 237. The breach deprived Mrs. Okie and Daniel of the benefit of the bargain which they reasonably expected. The actions of BHP do not permit Mrs. Okie and Daniel to be adequately compensated for that part of the benefit of which they have been deprived. Nor is it likely that BHP will attempt to cure its breach. Finally, as discussed in a later context, BHP's breach of the agreement does not comport with standards of good faith and fair dealing.

87. BHP's actions in failing to provide Mrs. Okie and Daniel with notice of its proposal to initiate an 8,500 acre Application as provided to the working interest owners in BHP's letter of May 23, 1989 is a breach of the terms of the Consent. That breach is a material and substantial one as it likewise deprives Daniel and Mrs. Okie of the benefit of the Consent which they are entitled to reasonably expect. Nor is there any means to adequately compensate them for that breach. Likewise, there is little or no likelihood that BHP will cure the defect at this point.

88. BHP has further breached the terms of the Consent in its actions to exclude Daniel, Mrs. Okie and their representatives from the working interest owners' meetings and technical meetings which have been held by BHP. That breach is likewise material and substantial for the reasons stated above.

89. BHP owed to Mrs. Okie and Mr. Daniel the duty of good faith and fair dealing in BHP's performance of the Consent. *Cheyenne Mining and Uranium Co. v. Federal Resources Corp., supra;* Restatement of Contracts, Second, Section 205; 5 Williams and Meyers, Oil and Gas Law, Sections 801–805, at p. 1–28.3. At a minimum the duty of good faith requires that the performing party to make reason-able efforts to effectuate the purpose of the agreement. The actions of Mr. Martin in failing to notify Mrs. Okie and Mr. Daniel of the events which occurred prior to June 24, 1988 constitutes an evasion of BHP's required performance under the Consent if not a deliberate intention to thwart the purpose of the Consent. Restatement of Contracts, Second, Section 205 Comment d at p. 100. Likewise, BHP has breached its duty of good faith and fair dealing owed to the plaintiff through its actions of May 23, 1989 and July 17, 1989. Those actions reinforce and establish the motive, plan and purpose of BHP in frustrating the reasonable expectations of Mr. Daniel and Mrs. Okie under the Consent. Finally, the Court finds that BHP's actions in excluding plaintiffs and their representatives from technical and working interest owners' meetings likewise breach BHP's duty of good faith and fair dealing.

90. BHP began a course of bad faith beginning in June of 1988 which has been clearly and convincingly demonstrated by the evidence.

91. Plaintiffs are entitled to equitable relief as a result of the breach of contract by defendant BHP, and plaintiffs are not barred by the doctrines of unclean hands, waiver or estoppel.

92. The Court makes all other findings of fact necessary to support a judgment herein.

93. The court reserves the right to make further findings of fact and conclusions of law based on the evidence prior to the entry of a final judgment herein.

The judgment followed, granting equitable relief by partial rescission and restoration:

1. Defendant BHP Petroleum Company, Inc., its successors and assigns ("BHP") hereafter, in accordance with the further terms of this Judgment and Decree, shall pay to the Plaintiffs, Margaret Daniel Okie and Bill Daniel, their successors, heirs and assigns a royalty ("BHP's differential royalty obligation") which shall be computed by taking the difference between six and one-quarter

percent (6.25%) ("lease royalty") of the value of all production from that certain well designated as the Bighorn 2–3 well located in the NW¼ of the SE¼ of Section 3, Township 28 North, Range 90 West, 6th P.M. and that royalty otherwise paid to the Plaintiffs under the Unit Agreement for production from such well ("unit royalty");

2. The obligation to pay BHP's differential royalty obligation shall constitute a lien upon BHP's working interests in the Madden Deep Unit (a federal oil and gas unit located in Fremont and Natrona Counties, Wyoming, designated as Number 14–08–00018874, as expanded and approved by the United States Department of Interior, Bureau of Land Management, March 21, 1986) and that any successor or assign to BHP's working interests shall take BHP's interests subject to the obligation imposed by this Judgment and Decree;

3. BHP shall be restored to its position prior to its June, 1988 breach of the 1970 Okie agreement by its retention of the appropriate proportion (lease royalty percentage (6.25%) less unit royalty percentage (2.478%) or 3.772%) of the well costs for the Bighorn No. 2–3 well ($19,-800,000) or Seven Hundred Forty–Six Thousand Eight Hundred Fifty–Six Dollars ($746,856); such amount to be retained by BHP, its successors or assigns from BHP's differential royalty obligation before any payment from BHP's differential royalty obligation is made to the Plaintiffs, their successors, heirs or assigns;

4. Plaintiffs' unit royalty shall not be affected by this Judgment and Decree[.]

It is recognized that direct breach of contract damages of approximately $50,000 were incurred by appellees as litigative costs. Those expenses were incurred during appellees' successful administrative agency efforts before the Bureau of Land Management resulting in reversal of appellant's request to increase the department's well site participating area. This administrative reversal was accomplished by appellees in appeal through a state director's review. However, that claim to legal damages to recover those litigative expenses was procedurally waived by appellees during the district court proceeding with apparent election to pursue the equitable remedy involving a greater ultimate recovery interest.

With those direct litigative expenses in the administrative appeal not presented in this appellate review, the majority rests its decision for reversal of the district court on a determination of fact that an adequate remedy at law (at least in part waived during litigation) existed and that, consequently, no right to the district court's rescission remedy was properly available. I cannot agree with that approach which substitutes this court as a fact finding tribunal when the trial decision was made by the district court based on extensive evidence produced in trial. I will, however, concur in the result on the basis that the partial rescission, as a matter of law, was not available and the remedy granted exceeded rescission restoration which would have been the appropriate equitable relief. Consequently, I concur only with the result in the majority decision.

In first concept, we are required to consider whether the adequate remedy at law decision is a factual determination or a question of law. It is an established generic concept that utilization of rescission as an equitable remedy is subject to the unavailability of an adequate remedy at law. *Farmers' State Bank of Riverton v. Northern Trust Co.*, 39 Wyo 46, 270 P. 163 (1928); *Knaebel v. Heiner*, 663 P.2d 551 (Alaska 1983). I do not find that general rule nor those cases factually dispositive for our present appellate resolution.[1]

---

**1.** It is apparent from a review of the texts and cases that the bland broad statement is in application frequently overbroad. One text, 27 Am. Jur.2d *Equity* § 86 (1966), states that "[t]here has been much discussion and some statements that are too broad regarding the effect upon the jurisdiction of a court of equity and the relief to be granted by it, of the existence or absence of a legal remedy, or remedy at law." (Footnote omitted.) 27 Am.Jur.2d, *supra*, § 87 (footnotes omitted) states:

The basic Wyoming law was established in *Farmers' State Bank of Riverton* where the appellate issue was the denial by the trial court of a cancellation of a guarantee agreement which had been resolved by the trial court in a factual decision. This court there said:

> The right of rescission and cancellation is not an absolute right, and rests in the sound discretion of the court, and that discretion should be exercised with caution, so that no material injustice will be produced by granting cancellation. * * * And the general rule is well settled that, in the absence of some independent ground of equitable jurisdiction, the relief of rescission and cancellation will not, with some possible exceptions not applicable here, be granted for a mere breach of contract, at least where there is an adequate remedy at law for damages, and the burden to prove the inadequacy of the remedy at law rests upon the party asking the cancellation.

*Farmers' State Bank of Riverton*, 39 Wyo. at 56, 270 P. at 166.

This present court conversely finds district court error in decision granting equitable relief by an appellate court factual decision that a legal remedy could be adequate. The other case cited in the majority, *Knaebel*, 663 P.2d 551, is consistent with the view I take. In that case, a denial of rescission by the trial court was reversed and the case was remanded to the trial court to determine, as a matter of fact, whether legal damages would be an adequate remedy. The Alaska Supreme Court stated:

> Appellees contend that Knaebel is not entitled to seek equitable rescission because: (1) Knaebel has an adequate remedy at law, (2) Knaebel seeks equity with "unclean hands," and (3) Knaebel did not, before seeking rescission, return to RAA the proceeds he received pursuant to the reorganization agreement.
>
> We decline to adjudicate the merits of these defenses as the trial court is best qualified to make such determinations.

*Knaebel*, 663 P.2d at 553. In support of the statement, the Alaska Supreme Court cited *Cowan v. Chalamidas*, 98 N.M. 14, 644 P.2d 528, 529 (1982), which, in a not so unusual concept, authenticated: "It is elementary that factfinding is a matter entirely within the province of the trial court * * *."

I find it unnecessary and even undesirable to attempt to factually resolve the issue of the adequacy of the legal damages contrary to the finding of fact adopted by the district court. In my perception, the granted remedy of partial rescission should provide our dispositive analysis. In answer to that issue, I find the district court's resolution to have been improvident and in error for two separate reasons.

I would not find partial rescission to be available for only the well site and its participating area as a portion of the entire leasehold which is included in the unitized area. Furthermore, the remedy provided is more than rescission when it places the litigant in a position far superior to what damage had been sustained as a result of the appellant's conduct constituting the breach of the contract.

I confine my conclusions to the complicated facts of this case and do not anticipate that partial rescission cannot ever be applied to part of a unitized oil and gas

---

So far as the effect of a legal remedy is concerned, there must, in order to exclude the jurisdiction of equity, be a remedy at law and, in addition, that remedy must be adequate. The general rule, subject to certain exceptions hereinafter discussed, is that if the law affords a remedy and that remedy is adequate, the cause may not be made the basis of a suit in equity. In other words, the broad, although not universally exclusive, rule is that equity will not intervene where there is an adequate remedy at law.

The text of 27 Am.Jur.2d in succeeding sections discusses the multiform exceptions. *See* 27 Am. Jur.2d *supra*, §§ 88 through 99.

In any event, it is clear that the implementation of the legal relief preclusive rule is factually based for the individual case decision and the legal remedy is a negative limitation on the exercise of equitable jurisdiction. 27 Am.Jur. 2d, *supra*, § 87.

lease.[2] In this case, the decision was also improper as a matter of law where the litigant had not lost value or compensation for any production from either their entire lease or from this particular well. No production equals no loss *in royalty payment.* Likewise for the same reason, granting a larger royalty interest for the future when no present royalty interest has been lost or diminished cannot be considered to be restoration of the status quo.

Obviously, we consider here equitable rescission as prospective since legal rescission as existent has not occurred. See the discussion in *Knaebel*, 663 P.2d at 554 and *Fryer v. Campbell*, 48 Wyo. 122, 43 P.2d 994 (1935). The more specific discussion is found in *Anderson v. Bell*, 70 Wyo. 471, 485–86, 251 P.2d 572, 576 (1952) (quoting 12 C.J.S., *Cancellation of Instruments*, § 5 at 945), which considers the specific difference:

"The remedy of rescission in equity must not, however, be confused with the rescission of a contract by a party thereto, as they are essentially different; in the latter case by his rescission or repudiation of the contract a party merely gives notice to the other party that he does not propose to be bound by the contract; whereas in the former case a court of equity grants rescission or cancellation, its decree wipes out the instrument, and renders it as though it does not exist."

Legal rescission differs in constituting a recognition of an existent status [3] while equitable rescission is an anticipatory judicial remedy.[4] In this case, since no election to rescind was made by the contracting party based on a contended breach, we are called to consider equitable rescission as a judicial remedy. *See Mad River Boat Trips, Inc. v. Jackson Hole Whitewater, Inc.,* 818 P.2d 1137 (Wyo.1991) and *Mad River Boat Trips, Inc. v. Jackson Hole Whitewater, Inc.,* 803 P.2d 366 (Wyo.1990).

It is a generally applied rule that an integrated or indivisible contract cannot be rescinded in part. *Holden v. Dubois,* 665 P.2d 1175 (Okl.1983). The right to rescind must be exercised in toto and the contract must stand in all of its provisions or fall altogether. *State Farm Fire & Cas. Co. v. Sevier,* 272 Or. 278, 537 P.2d 88 (1975); *Whatcom Builders Supply Co. v. H.D. Fowler, Inc.,* 1 Wash.App. 665, 463 P.2d 232 (1969); 17A Am.Jur.2d *Contracts* § 548 (1991). It is obvious that the issue here, determinable as a matter of law, is whether the contested agreement from which the breach arose is subject to division into definable different segments for each well that might be drilled within the entire leasehold estate. *See Sherman v. Medicine Shoppe Intern., Inc.,* 581 F.Supp. 445 (E.D.Pa.1984).

**2.** I do not ignore the citations provided by appellees relating to cases where the court considered canceling the undeveloped portion of an oil and gas lease property for contended violation by the lessee of the implied covenant for development. I do not find those cases to be antithetical to a non-partial rescission principle generally existent in the law nor factually compelling precedent here where the development of the area has been pursued at great cost and no production has yet been possible in advance of the construction of a major desulfurization gas processing plant. See, for example, the cases examining the undeveloped property lease forfeiture issue included among those cited by appellees. *Spaeth v. Union Oil Co. of California,* 710 F.2d 1455 (10th Cir.1983), *cert. denied* 476 U.S. 1104, 106 S.Ct. 1946, 90 L.Ed.2d 356 (1986); *Sinclair Oil & Gas Co. v. Masterson,* 271 F.2d 310 (5th Cir.1959), *cert. denied* 362 U.S. 952, 80 S.Ct. 864, 4 L.Ed.2d 870 (1960); *Magnolia Petroleum Co. v. Wilson,* 215 F.2d 317 (10th Cir.1954); *Byrd v. Bradham,* 280 Ark. 11, 655 S.W.2d 366

(1983); *Jones v. Interstate Oil Corp.,* 115 Cal. App. 302, 1 P.2d 1051 (1931); *Harris v. Morris Plan Co.,* 144 Kan. 501, 61 P.2d 901 (1936); *McMahan v. Boggess,* 302 S.W.2d 592 (Ky.1957); *Vetter v. Morrow,* 361 So.2d 898 (La.App.1978); *Beer v. Griffith,* 61 Ohio St.2d 119, 399 N.E.2d 1227 (1980); *Amerada Petroleum Corp. v. Sledge,* 151 Okl. 160, 3 P.2d 167 (1931).

**3.** *Meyer v. Ludvik,* 680 P.2d 459 (Wyo.1984); *North American Uranium, Inc. v. Johnston,* 77 Wyo. 332, 316 P.2d 325 (1957); *Gaido v. Tysdal,* 68 Wyo. 490, 235 P.2d 741 (1951).

**4.** *Mad River Boat Trips, Inc. v. Jackson Hole Whitewater, Inc.,* 818 P.2d 1137 (Wyo.1991); *Mad River Boat Trips, Inc. v. Jackson Hole Whitewater, Inc.,* 803 P.2d 366 (Wyo.1990); *Walter v. Moore,* 700 P.2d 1219 (Wyo.1985); *Hagar v. Mobley,* 638 P.2d 127 (Wyo.1981); *Cady v. Slingerland,* 514 P.2d 1147 (Wyo.1973); *Fryer,* 43 P.2d 994; *Farmers' State Bank of Riverton,* 270 P. 163.

That contention is presented by a request for partial rescission relating to the application of the underlying agreement to a portion of the property covered by the agreement. This claim advances a right to secure a greater royalty interest in the separate well within a participating area while the basic agreement between the parties otherwise remains in full effect. Under the circumstance presented, I would not accept a legal conclusion granting partial rescission for the royalty interest owner to retain benefit from the general unitization agreement and simultaneously granting a greater interest in the participating area and involved well than was provided by written documentation. *Holden,* 665 P.2d 1175. In a guarantee contract context, this court has identically identified the rule: "The evidence herein decisively shows that the parties were relying upon the contract involved herein and upon nothing else and the plaintiffs cannot now rely upon part of the contract and repudiate the rest to the prejudice of the defendant." *McKenzie v. Neale Construction Co.,* 75 Wyo. 175, 186, 294 P.2d 355, 359 (1956). *See also Evans v. Brubaker,* 207 Okl. 42, 247 P.2d 511 (1952).

For a similar reason, the increased mineral interest result of the district court's order goes beyond restoration to something akin to punitive damage by providing an increased ownership to the litigant. I find no justified legal basis for the judgment granted within the general concept of equitable rescission, which as a theory of the law only justifies restoration to the status quo "as nearly as can be" when compared to this case. Here, no real restoration is required since no actual diminution of the mineral estate in production royalty payment has occurred.

The rule has been stated by this court:

An essential part of the rescission of a contract is the restoration of the parties to status quo. 17 Am.Jur.2d Contracts § 152. The rule of restoration is one of justice and equity not procedure and, therefore, must be reasonably applied and construed. *Id.*

"It is the general rule that a party seeking to rescind a contract must return the opposite party to the position in which he was prior to entering into the contract. However, this is not a technical rule, but rather it is equitable and requires practicality in readjusting the rights of the parties. The standard used is 'substantial restoration of the status quo.' How this is to be accomplished, or indeed whether it can, is a matter which is within the discretion of the trial court, under the facts as found to exist by the trier of the fact." (Citations omitted.) *Smith v. Huber,* Colo.App., 666 P.2d 1122, 1124–1125 (1983).

*Walter v. Moore,* 700 P.2d 1219, 1228 (Wyo. 1985).

Obviously, the significant increase of appellees' royalty interest by transfer from the share owned by the operator appellant was more than restoration of the status quo. Consequently, I would find an abuse of discretion in the provision for relief granted to the appellees. *See Mad River Boat Trips, Inc.,* 818 P.2d 1137; *Mad River Boat Trips, Inc.,* 803 P.2d 366; *Hagar v. Mobley,* 638 P.2d 127 (Wyo.1981); *Gaido v. Tysdal,* 68 Wyo. 490, 235 P.2d 741 (1951).

I agree with the decision of the majority that the judgment of the district court should be reversed, but on a basis different from the one presented in the majority anchored in rejection and redetermination of the finding of fact adopted by the district court. Consequently, I only concur in the result.

CARDINE, Justice, concurring in part and dissenting in part.

I agree that the trial court should not have granted partial recision in this case, since Mrs. Okie's proper remedy was damages. Unlike the majority, however, I would remand to the trial court for a determination of the damages to be awarded her.

I. *Procedural Concerns*

I part company with the majority in its implication that Mrs. Okie's "waiver" of

damages below leaves her without a remedy. The majority takes the position that Mrs. Okie waived damages and is stuck with that waiver. However, the record shows that Mrs. Okie's waiver was an *election of a remedy* as distinguished from a real "waiver" for which consideration is given or which causes detrimental reliance by the other party. Since we determine only that her *elected* remedy, partial recision, was ineffective, and make no determination against her on any other theory, our decision should not preclude subsequent proceedings for damages.

> Where there is really but one remedy and not a choice, recourse to one remedy which proves futile does not preclude thereafter successfully invoking a second more appropriate remedy.

*Coronado Oil Co. v. Grieves*, 603 P.2d 406, 413 (Wyo.1979), citing *Roberts v. Roberts*, 62 Wyo. 77, 94, 162 P.2d 117, 122 (1945). *See also* 5A A. Corbin, *Corbin on Contracts* § 1218 (1964) (election of unavailable remedy does not bar subsequent suit, even if first suit carried to judgment, provided that court only determines unavailability of remedy).

To require Mrs. Okie to file another suit would be a waste of judicial resources. Everything but the proper relief has already been determined by the trial court and is not disturbed here. The trial court had before it evidence sufficient to convince a majority of this court that damages were the appropriate relief in this case. The proper remedy is to remand for determination of damages.

Review of the trial record shows that although damages were waived, extensive proof of damages was presented by both sides. George Parks testified, over BHP's objection, to the additional value of Mrs. Okie's royalty interest based on the consent agreement. Both George Parks and Roy Guess testified that an "Exhibit 64" reflected the expenses Mrs. Okie incurred as the result of their participation in the BLM appeal. (Exhibit 64 was apparently never entered into evidence.) Donald Leo Stinson estimated that the consent agreement enhanced the Okie interests by five to ten percent, and that Mr. Daniel and Mrs. Okie would lose $750,000.00 to $1,500,000.00 if they lost the unique value of the consent agreement. BHP elicited testimony from Mr. Daniel about the increase in value he would receive from his royalty interest if his proceeds from the 2–3 well were treated on a lease basis. BHP also asked Mr. Daniel to detail the harm he had suffered, as noted in the majority opinion. BHP further presented the testimony of Patrick Martin, who compared the plaintiffs' projected annual royalty receipts from 2–3 based on a 4,000 acre circle, a 2,560 acre circle, and a lease basis. Finally, BHP mentioned in closing a damage figure of $25,000, based on the BHP appeals, to show why partial recision was improper.

Wyoming Rule of Civil Procedure 54(c) allows the trial court to fashion appropriate relief where, as here, a party has shown entitlement to it:

> Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, *even if the party has not demanded such relief in his pleadings.* [emphasis added]

This rule has had broad application. It is not confined to situations where a party later asserts a theory he omitted in the pleadings; rather, it allows the trial court to award relief never contemplated by either party. *See Walton v. Atlantic Richfield Co.*, 501 P.2d 802, 805 (Wyo.1972) (trial court not bound by legal theories asserted by parties; may grant relief to which prevailing party is entitled, whether or not pled); *and cf. Illinois Physicians Union v. Miller*, 675 F.2d 151, 158 (7th Cir.1982) (court could award unrequested damages in declaratory judgment proceeding (but compare the federal Declaratory Judgment Act with W.S. 1–37–101 et seq.)); *Nab v. Hills*, 92 Idaho 877, 452 P.2d 981, 987–88 (1969) (reformation of contract granted although not requested by defendants); *Fireside Marshmallow Co. v. Frank Quinlan Const. Co.*, 199 F.2d 511 (8th Cir.1952) (fact that both parties treated action as one for enforcement of con-

tract did not prevent court from granting recision based on proof at trial).

Now that the trial court is no longer under the erroneous perception that equitable relief is available and appropriate, it can grant relief in damages on remand. Our rules give us the power to remand for correction of such errors.

A judgment rendered or final order made by a district court may be reversed in whole or in part, vacated or modified by the Supreme Court for errors appearing on the record.

W.R.A.P. 1.04.

When a judgment or final order is reversed, either in whole or in part, in the district court, or the Supreme Court, the court reversing the same shall proceed to render *such judgment as the court below should have rendered,* or remand the cause to the court below *for such judgment or such proceedings as the reviewing court may direct.* [emphasis added]

W.R.A.P. 7.03.

*Cf. also Allen v. Allen,* 550 P.2d 1137, 1144 (Wyo.1976) (supreme court could modify decree of restitution to provide for reconveyance in order to avoid need for another action for specific performance after remand).

On remand, I would instruct the trial court to hold a hearing at which both parties could present further evidence on the damage issue. The hearing is needed not only to allow Mrs. Okie to present further testimony, but also because BHP objected to testimony on damages presented below; thus BHP would suffer undue prejudice if a judgment for damages were entered under W.R.C.P. 54(c) without a further hearing. In short, I would remand to allow Mrs. Okie to pursue her damage remedy, subject to BHP's right to present rebuttal evidence.

## II. *Calculation of Damages*

The majority does not decide what the proper measure of damages should be. It mentions the costs of Mrs. Okie's appeals to the BLM but also "damages for the loss of such a unique agreement." Maj. op. at 877. Obviously, the amount of damages would differ significantly depending on which of these measures were adopted.

The damage remedy requested in Mrs. Okie's complaint is similar to the partial recision rejected by this court, only with retrospective application. Mrs. Okie requested "damages [which] are the difference between the amount of proceeds Margaret Okie and Bill Daniel would receive under the First Revision Permitting Enlargement and that which they would have received solely on the basis of the Lease."

Damages for breach of contract are designed to put the injured party in the position she would have been if the other party had performed, less proper deductions. *Robert W. Anderson Housewrecking and Excavating, Inc. v. Board of Trustees, School Dist. No. 25,* 681 P.2d 1326, 1333 (Wyo.1984). The injured party should receive compensation commensurate with her loss and no more. *Andersen v. Corbitt,* 777 P.2d 48, 52 (Wyo.1989); *Hunt v. Thompson,* 19 Wyo. 523, 120 P. 181, 184, *reh'g denied* 20 Wyo. 523, 122 P. 624 (1912).

The following case discusses the amount of damages to be awarded for breach of a unitization agreement. *Massey v. Gulf Oil Corp.,* 508 F.2d 92 (5th Cir.1975), *cert. denied* 423 U.S. 838, 96 S.Ct. 67, 46 L.Ed.2d 57 (1975), *reh'g denied* 510 F.2d 1407 (1975). In *Massey,* the operator's breach involved "high grading" the unit (extracting only the oil most easily and least expensively available). Damages were calculated based on loss of royalties due to the improper management. *Massey,* at 96, n. 4.

In this case, there has been no loss of royalties. However, Mrs. Okie claims to have lost the special value of her royalty interest. She argues that the special terms of the consent agreement are worthless if they can be disregarded at will by the operator. As the majority points out, to the extent that Mrs. Okie's analysis is based on the possibility of future harm rather than past breach, it may safely be disregarded because BHP no longer oper-

ates the unit and the new operator will hopefully be cautioned not to repeat the harm. Thus, we must treat the consent agreement as if it retained its full value; only injury arising from past breach is at issue.

It seems clear that the damages Mrs. Okie suffered here from BHP's breach of contract were the costs of her appeals through the BLM. Had the breach not occurred, she would have been able to present her objections before the larger unit plans were approved. She might not have needed to take appeal. Therefore, I would hold that she is entitled to recover from BHP these costs which are related to her appeals, and the costs of this appeal as well.